**COMMONWEALTH of Pennsylvania**

**v.**

**Emuel C. HENLEY, Appellant.**

Superior Court of Pennsylvania.

Argued March 9, 2006.

Filed Sept. 29, 2006.

Scott Coffery, Pittsburgh, for appellant.

Michael W. Streily, Asst. Dist. Atty., and James Gilmore, Asst. Dist. Atty., Pittsburgh, for Com., appellee.

BEFORE: FORD ELLIOTT, P.J., JOYCE, MUSMANNO, ORIE MELVIN, TODD, KLEIN, BOWES, GANTMAN, and PANELLA, JJ.

OPINION BY FORD ELLIOTT, P.J.:

¶ 1 Emuel C. Henley appeals from the judgment of sentence of November 16, 2000, imposing a mandatory term of life imprisonment following his conviction for murder in the first degree. After careful review, we affirm.

¶ 2 As recited by the trial court, the facts of this case are as follows:

The defendant was charged at CC 199901083 with one count of Criminal Homicide; at CC 19903107 with two counts of violating the Uniform Firearms Act (VUFA) and, at CC 19903109, with one count of Robbery. The defendant's first trial ended in a mistrial on January 24, 2000 because of the illness of his trial counsel. New counsel was appointed and the matter proceeded to a jury trial that began on November 14, 2000. At the conclusion of that trial the jury found the defendant guilty of Murder of the First Degree and of the two VUFA counts. The jury acquitted him of Robbery. The Court then sentenced the defendant to life imprisonment at the Homicide count and to no[ ] further penalty at the remaining counts. This timely appeal[ ] followed. In this appeal, defendant challenges the Court's denial of his Motion to Suppress Evidence.

The defendant sought suppression of an inculpatory statement he made after he was arrested for the VUFA charge following the stop of his vehicle. The defendant claimed in the suppression motion that the incriminating statement was obtained more than six hours after his arrest and prior to his arraignment. He also claimed in his Motion that he was questioned after he had asked to call family members so they could obtain a lawyer. At the hearing, defense counsel orally amended the Motion to include a claim that the search of the vehicle was not a valid inventory search. [1]

At the suppression hearing, the Commonwealth presented testimony from the officers who conducted the stop and from the homicide detectives who were investigating the death of the victim, Tyrone Swan. Homicide Detective Dennis Logan testified that [ ] on January 10, 1999 he received a call from the sister of the Mr. Swan who told him that '... the guy who had shot her brother, whose nickname was "Toot", was in this particular car. She gave the color, a description of the car and said the car had just left Bonifay Street and was headed towards Mr. [sic] Oliver....' (N.T., 1/26/00, p. 21–22). The victim ha[d] been shot the previous day. Detective Logan then broadcast a description of the vehicle, asking officers who encountered the vehicle to stop it and identify the drive[r] and to detain the driver for questioning by homicide detectives.

Officer Harry J. Hilley testified that he heard the broadcast, which included the registration number of the vehicle. A short time later, he saw a vehicle matching the description. He pulled behind the vehicle and as he looked at the plate to confirm that it was the correct vehicle, he noticed that the registration sticker was expired. He then activated his overhead lights and the vehicle pulled to the side of the street. (N.T. 1/26/00; pp. 5–7). Officer Hilley approached the vehicle and spoke with the defendant. The defendant told the officer that he did not know if the vehicle's registration was current and also admitted that he did not have insurance on the vehicle. The officer then told the defendant that because the vehicle did not have a valid registration and was not insured, the defendant would be cited for these violations and the vehicle would have to be towed. (N.T. 1/26/00; p. 8). The defendant exited the vehicle and Officer Hilley conducted an inventory search of the vehicle, which revealed a .38[c]aliber revolver under the driver's seat. When the defendant admitted that he did not have a permit to carry a concealed weapon, he was placed under arrest for violating the Uniform Firearms Act. (N.T. 1/26/00; p. 9).

Officer Hilley testified that it was the policy of the police department to conduct an inventory search of any vehicle taken into possession. They are required by this policy to produce an inventory of the entire contents of the vehicle. (N.T. 1/26/00; p. 9). He further related that because the street where the vehicle was stopped did not permit parking on either side, he had to have the vehicle towed. (N.T. 1/26/00; p. 45).

Detective Logan drove to the scene of the traffic stop and spoke with the defendant as he sat in the back of a police wagon. He identified himself and asked if the defendant would come with him to answer some questions. The defendant agreed to go. (N.T. 1/[2]6/00; p. 23). This took place at 2:21 p.m. He took the defendant to the homicide office, arriving at 2:36 p.m. (N.T. 1/26/00; p. 24). The defendant was advised of his rights and signed a pre-interrogation warning form, which set forth those rights. *(see* Commonwealth Suppression Exhibit 1). Over the course of the next hour the defendant, after initially denying any involvement in the death of Mr. Swan, admitted that he had shot the victim. (N.T. 1/26/00; pp. 25–[2]7). Detective Logan denied that the defendant ever requested an attorney or that he be allowed to speak with family members to request that they summon an attorney. (N.T. 1/26/00; p. 27). The interview lasted until approximately 3:31 p.m. when the defendant was given food and

drink. The detective checked on him again at 4:21 p.m. and then waited for the coroner's office. (N.T. 1/26/00; pp. 26–27).

[Footnote 1] Each of these issues was raised in an Omnibus Pre-trial Motion filed by defendant's new counsel following the first mistrial.

Trial court opinion, 4/25/02 at 2–5.

¶ 3 Appellant initially filed a notice of appeal on December 14, 2000. The Honorable Jeffrey A. Manning ordered appellant to file a concise statement of matters complained of on appeal pursuant to Pa.R.A.P. 1925(b). (Order, 1/22/02; Docket No. 18.) On October 28, 2002, this court filed a judgment order affirming the judgment of sentence. *Commonwealth v. Henley,* No. 2145 WDA 2000, unpublished judgment order, 816 A.2d 329 (Pa.Super. filed October 28, 2002). We determined that appellant had failed to file his 1925(b) statement as part of the certified record; and, therefore, his issues were waived. *Id. See Commonwealth v. Lord,* 553 Pa. 415, 719 A.2d 306 (1998); *Commonwealth v. Schofield,* 585 Pa. 389, 888 A.2d 771 (2005); *Commonwealth v. Castillo,* 585 Pa. 395, 888 A.2d 775 (2005).

1. Post–Conviction Relief Act, 42 Pa.C.S.A. §§ 9541–9546.

2. On July 12, 2004, the trial court entered an order appointing new counsel and granting additional time to file a notice of appeal. Subsequent to filing the notice of appeal, counsel filed a motion to withdraw; on October 5, 2004, the motion was granted and present counsel was appointed to represent appellant.

3. We note with some confusion that appellant frames his issues in terms of ineffectiveness of trial counsel. Appellant avers that trial counsel, who also represented appellant on his first appeal, was ineffective for failing to comply with the trial court's order to file of record a 1925(b) statement. Generally, this court is precluded from addressing issues of trial counsel ineffectiveness on direct appeal.

¶ 4 On December 9, 2002, appellant filed a timely *pro se* PCRA[1] petition alleging ineffectiveness of counsel for failing to file a 1925(b) statement and requesting restoration of his appellate rights. (Docket No. 21.) New counsel was appointed and filed an amended PCRA petition on June 30, 2004. (Docket No. 24.) On July 7, 2004, appellant's direct appeal rights were reinstated *nunc pro tunc.* (Docket No. 25.) On August 11, 2004, appellant filed this direct appeal. (Docket No. 26.)[2] A 1925(b) statement was filed on November 12, 2004; and on November 19, 2004, the trial court ordered that the record be transmitted, relying on its prior opinion dated April 25, 2002.

¶ 5 Appellant seeks to suppress the evidence of the gun and his confession based on (1) the illegal inventory search and (2) the illegal traffic stop of his vehicle.[3] In reviewing the denial of suppression, the following applies:

Our standard of review of a denial of suppression is whether the record supports the trial court's factual findings and whether the legal conclusions drawn therefrom are free from error. Our scope of review is limited; we may con-

*See Commonwealth v. Grant,* 572 Pa. 48, 813 A.2d 726 (2002), and its progeny. However, in the instant case, it was completely unnecessary for appellant to "layer" his claims by alleging ineffectiveness of prior counsel. Appellant's direct appeal rights were reinstated *nunc pro tunc* due to prior counsel's failure to file the requisite 1925(b) statement. Therefore, appellant does not have to allege trial counsel ineffectiveness in order to preserve his claims. Appellant's substantive claims on the instant appeal regarding the vehicle stop and subsequent inventory search were raised in the court below via pre-trial motions and are preserved for appellate review on direct appeal. Therefore, the rule announced in *Grant* is inapplicable to the case before us, and we may address appellant's claims.

sider only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the court erred in reaching its legal conclusions based upon the facts. *Commonwealth v. Reppert*, 814 A.2d 1196, 1200 (Pa.Super.2002) (*en banc*) (citations and quotation marks omitted).

¶ 6 We choose to address appellant's second issue first, the legality of the initial traffic stop. Based on the radio call, Officer Hilley pulled behind appellant's car. It was at that time that he noticed the registration sticker on the license plate had expired. (Notes of testimony, 1/26/00 at 6.) Officer Hilley's testimony was clear that he saw the expired registration sticker prior to stopping appellant's vehicle. *(Id.* at 7, 15.) Officer Hilley activated his lights and siren and proceeded with the traffic stop. *(Id.* at 7.) After running the plates through index to confirm they were expired, Officer Hilley approached the vehicle and asked appellant whether he was aware his registration was expired. *(Id.)* Appellant replied that he was not sure. *(Id.* at 7–8.) Officer Hilley asked appellant whether or not he had insurance; appellant stated that he did not. *(Id.* at 8.) At that point, Officer Hilley informed appellant that he was going to issue two citations, his vehicle would be towed, and he asked appellant to exit from the vehicle. *(Id.)*

¶ 7 It is well settled that an officer may stop a motor vehicle if the officer reasonably believes that a provision of the Motor Vehicle Code is being violated.

*Commonwealth v. Pless*, 451 Pa.Super. 209, 679 A.2d 232, 233 (1996), citing *Commonwealth v. DeWitt*, 530 Pa. 299, 304, 608 A.2d 1030, 1032 (1992). "Incident to this stop, the [officer] may check the vehicle's registration and the driver's license and issue a citation." *Id.* (citation omitted).

¶ 8 Appellant argues that because Officer Hilley was following his car at Detective Logan's request and intended to pull him over regardless of whether or not he was in violation of the Code, this renders the stop somehow illegal. (Appellant's brief at 18.) We have to look at the facts as they are, not what they might have been; Officer Hilley's testimony is clear that he saw appellant's expired registration sticker prior to pulling the vehicle over. Appellant does not contest the fact that an expired registration is a violation of the Motor Vehicle Code.[4] Therefore, the stop was valid.

¶ 9 Next, we consider appellant's argument that the impoundment of his vehicle and subsequent inventory search were unlawful and the evidence should have been suppressed. Inventory searches are a well-defined exception to the search warrant requirement. *Colorado v. Bertine*, 479 U.S. 367, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987); *Commonwealth v. Nace*, 524 Pa. 323, 327, 571 A.2d 1389, 1391 (1990), *cert. denied,* 498 U.S. 966, 111 S.Ct. 426, 112 L.Ed.2d 411 (1990).

'The purpose of an inventory search is not to uncover criminal evidence. Rather, it is designed to safeguard seized items in order to benefit both the police and the defendant.' *Commonwealth v. Woody*, 451 Pa.Super. 324, 679 A.2d 817, 819 (1996). *See also Commonwealth v.*

---

4. **(a) Driving unregistered vehicle prohibited.**—No person shall drive or move and no owner or motor carrier shall knowingly permit to be driven or moved upon any highway

any vehicle which is not registered in this Commonwealth unless the vehicle is exempt from registration.

75 Pa.C.S.A. § 1301(a).

*Brandt,* 244 Pa.Super. 154, 366 A.2d 1238, 1241 (1976) *(en banc).* Inventory searches serve one or more of the following purposes: (1) to protect the owner's property while it remains in police custody; (2) to protect the police against claims or disputes over lost or stolen property; (3) to protect the police from potential danger; and (4) to assist the police in determining whether the vehicle was stolen and then abandoned. *See South Dakota v. Opperman,* 428 U.S. 364, 369, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976).

A warrantless inventory search of an automobile is different from a warrantless investigatory search of the same. An inventory search of an automobile is permitted where: (1) the police have lawfully impounded the automobile; and (2) the police have acted in accordance with a reasonable, standard policy of routinely securing and inventorying the contents of the impounded vehicle. *Id.* at 368–372, 96 S.Ct. 3092. A warrantless investigatory search of an automobile requires both a showing of probable cause to search and exigent circumstances. *See Commonwealth v. Luv,* 557 Pa. 570, 735 A.2d 87 (1999); *Commonwealth v. White,* 543 Pa. 45, 669 A.2d 896 (1995).

In determining whether a proper inventory search has occurred, the first inquiry is whether the police have lawfully impounded the automobile, *i.e.,* have lawful custody of the automobile. *Opperman,* 428 U.S. at 368, 96 S.Ct. 3092. The authority of the police to impound vehicles derives from the police's reasonable community care-taking functions. *Id.* Such functions include removing disabled or damaged vehicles from the highway, impounding automobiles which violate parking ordinances (thereby jeopardizing public safety and efficient traffic flow), and protecting the community's safety. *Id.* at 368–369, 376 n. 10, 96 S.Ct. 3092.

The second inquiry is whether the police have conducted a reasonable inventory search. *Id.* at 370, 96 S.Ct. 3092. An inventory search is reasonable if it is conducted pursuant to reasonable standard police procedures and in good faith and not for the sole purpose of investigation. *See Bertine,* 479 U.S. at 374, 107 S.Ct. 738 ('reasonable police regulations relating to inventory procedures of automobiles administered in good faith satisfy the Fourth Amendment, even though courts might as a matter of hindsight be able to devise equally reasonable rules requiring a different procedure'). *Compare Florida v. Wells,* 495 U.S. 1, 4–5, 110 S.Ct. 1632, 109 L.Ed.2d 1 (1990) (where police had no standard procedure with respect to the opening of closed containers found during inventory searches, marijuana found in a closed suitcase was properly suppressed). Said another way, the inventory search must be pursuant to reasonable police procedures, and conducted in good faith and not as a substitute for a warrantless investigatory search.

*Commonwealth v. Hennigan,* 753 A.2d 245, 254–255 (Pa.Super.2000).

¶ 10 At the suppression hearing in January 2000, the validity of the inventory search conducted pursuant to City of Pittsburgh Police Department procedures was raised and extensively discussed. Appellant argued that the impounding of the vehicle for lack of registration and insurance was not covered by the relevant police standard order, and therefore the inventory search was not proper procedure. The trial court resolved the issue as follows:

The subsequent search of the vehicle was also proper. It was made pursuant

to the policy of the Pittsburgh Police regarding inventory searches. It was not disputed that [appellant]'s vehicle did not have a current registration and that it did not carry insurance. It was also not disputed that the vehicle was stopped in an area where parking was not permitted on either side of the street. The officer could not permit [appellant] to move the vehicle; department policy prohibited the officer from moving it himself and it could not be left where it was because parking was not permitted in that area. The only course left to the officer was the one he followed, the towing of the vehicle. Since it was going to be towed, department policy required that an inventory search be conducted. It was during this lawful search that the weapon, which gave the officer probable cause to arrest [appellant], was found.

A warrantless inventory search of an automobile is different from a warrantless investigatory search of the same. An inventory search of an automobile is permitted where: (1) the police have lawfully impounded the automobile; and (2) the police have acted in accordance with a reasonable, standard policy of routinely securing and inventorying the contents of the impounded vehicle. *Commonwealth v. Hennigan,* 753 A.2d 245 (Pa.Super.2000). It is clear that the officers lawfully impounded the vehicle. It was not registered or insured. It is illegal to operate an unregistered vehicle on the streets of the Commonwealth. It is also illegal to operate a vehicle that is not covered by insurance. [Appellant] could not be permitted to drive the vehicle away. Moreover, the vehicle was stopped in an area where it could not be legally parked. [Appellant] did not dispute that the vehicle was in a 'no parking' area. Since [appellant] could not remove the vehicle and it could not [be] left where it was stopped, the officers properly impounded the vehicle.

The second requirement, that the inventory search be conducted in accordance with a reasonable, standard policy, was also met. The officer explained that the department policy was that whenever a vehicle is seized the seizing officer is to conduct a search of the entire vehicle to identify its contents. [Appellant] did not suggest that the inventory policy of the Pittsburgh Bureau of Police was unreasonable. As the evidence clearly established that the vehicle was properly impounded and that the officer followed a reasonable and standard policy established by the Pittsburgh Police, [appellant]'s challenge to the inventory search was properly rejected.

Trial court opinion, 4/25/02 at 6–7.

¶ 11 While this case was pending on *nunc pro tunc* appeal, a panel of this court rendered a decision in *Commonwealth v. Thurman,* 872 A.2d 838 (Pa.Super.2005), *appeal denied,* 585 Pa. 688, 887 A.2d 1241 (2005). Appellant adequately challenged the validity of the City of Pittsburgh Police Department impoundment procedures before the suppression court and now argues for the applicability of *Thurman* on appeal. As will be addressed *infra, Thurman's* discussion of the validity of such police department impoundment procedures would require reversal in this case if followed. We specifically decline to adopt the *Thurman* analysis and its application of 75 Pa.C.S.A. § 6309.2 to the facts of this case.

¶ 12 Section 6309.2 of the Vehicle Code [5] addresses the immobilization, towing, and

---

5. This statute was enacted in 1996 and was therefore in effect at the time of appellant's

storage of vehicles for driving without registration or insurance and provides, in relevant part:

(a) **General rule.**—Subject to subsection (d), the following shall apply:

. . . .

(2) If a motor vehicle or combination for which there is no valid registration or for which the registration is suspended for failing to maintain financial responsibility, as verified by an appropriate law enforcement officer, is operated on a highway or trafficway of this Commonwealth, the motor vehicle or combination shall be immobilized by the law enforcement authority, and the appropriate judicial authority shall be so notified.

(b) **Procedure upon immobilization.**—

. . . .

(2) When a vehicle is immobilized pursuant to subsection (a)(2), the owner of the vehicle may appear before the appropriate judicial authority within 24 hours from the time the vehicle was immobilized. The appropriate judicial authority may issue a certificate of release upon:

(i) the furnishing of proof of registration and financial responsibility by the owner of the vehicle; and

(ii) receipt of evidence that the operator of the vehicle has complied with the pertinent provisions of Title 42 and this title.

(3) If a certification of release is not obtained within 24 hours from the time the vehicle was immobilized, the vehicle shall be towed and stored by the appropriate towing and storage agent under subsection (c).

75 Pa.C.S.A. § 6309.2(a)(2), (b)(2)(i), (ii), (b)(3).

¶ 13 In *Thurman,* Michael Thurman was stopped for driving with an expired inspection sticker and a malfunctioning brake light. *Id.* at 839. During the traffic stop, the officer determined, through the Penn-DOT computer system, that Thurman's registration had been suspended due to insurance cancellation. *Id.* Pursuant to Norristown Police Department General Order 2000–23, the officer impounded Thurman's vehicle and had it towed. *Id.* Prior to towing and pursuant to General Order 2000–23, an inventory search of the car was conducted which uncovered one plastic baggie of marijuana and three plastic baggies of cocaine. *Id.*

¶ 14 The trial court denied Thurman's motion to suppress, and he appealed after being found guilty of various drug offenses. A unanimous panel of this court reversed, holding that absent adoption by local ordinance of Section 6309.2, the police lacked authority to impound and tow the vehicle and therefore the inventory search was invalid. The *Thurman* court determined that Section 6309.2 was enabling legislation and that the failure of Montgomery County to adopt the statute by local ordinance invalidated the police department General Order for impounding and towing a vehicle. "Thus, towing a vehicle for failure to have proper registration in the Borough of Norristown can be accomplished only by ordinance and not by general order of the police department." *Id.* at 840–841.

¶ 15 Similarly, in the instant case, there is no evidence presented that the City of Pittsburgh has adopted by ordinance Section 6309.2. Rather, the officers in this case relied upon the Pittsburgh Police impoundment and inventory procedure for an unregistered/uninsured vehicle

arrest.

stopped in the middle of a city street. Upon careful further review of Section 6309.2, we disagree that the only authority local governments have for the impoundment and towing of vehicles effectively immobilized by lack of registration or insurance derives from Section 6309.2. To the contrary, with regard to adoption of Section 6309.2, our legislature provided:

> The addition of 75 Pa.C.S. § 6309.2 shall take effect as follows:
>
> (i) In cities of the first class, in 120 days. [ [6] ]
>
> (ii) In all other areas of this Commonwealth, upon adoption of a local ordinance *electing applicability* of section 6309.2.

75 Pa.C.S.A. § 6309.2, Historical and Statutory Notes (emphasis added).

¶ 16 In our view, then, the legislature's use of the phrase "electing applicability" indicates an intent that the provisions of Section 6309.2, including the right to 24–hour notice before the vehicle may be towed, take effect only in cities of the first class; *i.e.*, Philadelphia, unless specifically adopted by local ordinance elsewhere. In other words, whereas the panel in *Thurman* held that municipalities across the Commonwealth, including Norristown, only have authority to impound and tow an unregistered/uninsured vehicle if they adopt Section 6309.2 by local ordinance, we believe the plain language of the statute indicates that municipalities are only subject to the specific procedures set forth in the statute if they choose to adopt them.[7]

¶ 17 Therefore, we specifically disapprove the analysis in *Thurman* to the effect that:

> even if General Order 2000–23 has been properly adopted in every other way, it would still be unenforceable as section 6309.2 specifically addresses the same subject and therefore supersedes the general order. Section 6309.2 does not allow impounding and towing in the manner in which it was done in this circumstance.

*Id.* at 841 (footnote omitted).

¶ 18 The trial court and the Commonwealth further advance the argument

6. The only city of the first class in the Commonwealth is Philadelphia.

7. This "local option" provision was subject to debate and discussion at the time of the legislation's adoption.

> [Mr. FAIRCHILD] Mr. Speaker, if one of my constituents would fail to renew their registration on time—which, unfortunately, my office gets a lot of these—and they were driving in, let us say, the worst section of Philadelphia or the most rural section of rural Pennsylvania and they were stopped and their car was impounded, what happens to that driver of that vehicle at that particular point in time?
>
> Mr. HORSEY. Mr. Speaker, under present Philadelphia standards, if a person is stopped without the appropriate papers, under the impoundment rules, he or she is taken to the nearest police station, dropped off, and he cannot drive his automobile. His automobile is disabled, but he is not left in that worst area.
>
> Mr. FAIRCHILD. Where does it say in the bill that they are—
>
> Mr. HORSEY. It does not say that in the legislation, Mr. Speaker, but it has been the policy in Philadelphia for years. The present—
>
> Mr. FAIRCHILD. What about the policy for the rest of the State?
>
> Mr. HORSEY. Well, Mr. Speaker, this legislation covers Philadelphia County specifically, and each other county has a right to implement their own structure in terms of what they want in terms of impoundment. This only covers Philadelphia presently. Other counties have local option. If they want to implement it, then they can implement it in the same way that we do it in Philadelphia.

HB 2360, 1995–96 reg. session, Legislative Journal–House (Pa.), June 28, 1996 p.1966. The bill passed with the "local option" in place.

that because appellant's vehicle was pulled over in a "no-parking" zone, that Officer Hilley had the non-statutory authority derivative of his care-taking function as a police officer to immediately impound and tow the vehicle. Officer Hilley testified:

At that point it (parking the vehicle on the side of the road) was not feasible because of the fact that it was a no parking area. I can't permit someone to park their vehicle illegally. And if he would have pulled up on the sidewalk, one, that's illegal to begin with, and also, there was a large amount of snow out that day, and he couldn't even pull onto the sidewalk. Whenever I initiated the traffic stop we had to stop right on the roadway.

Notes of testimony, 1/26/00 at 42. The Commonwealth also argues that by virtue of being unregistered and uninsured, the vehicle itself was "illegal" and could not be moved or left unattended.

¶ 19 In addressing the Commonwealth's argument that the police had lawfully impounded Thurman's vehicle as part of their "community care-taking function," *Thurman* opined:

8. **§ 3352. Removal of vehicle by or at direction of police**
(a) **Outside business and residence districts.**—Whenever any police officer finds a vehicle in violation of any of the provisions of section 3351 (relating to stopping, standing and parking outside business and residence districts), the officer may move the vehicle, or cause the vehicle to be moved, or require the driver or other person in charge of the vehicle to move the vehicle, to a position off the roadway where the vehicle will not interfere unduly with the normal movement of traffic or constitute a safety hazard.
(b) **Unattended vehicle obstructing traffic.**—Any police officer may remove or cause to be removed to a place of safety any unattended vehicle illegally left standing upon any highway, bridge, causeway or in any tunnel, in such position or under such circumstances as to interfere unduly with

While case law cited by the Commonwealth and the trial court indicates there is a concurrent 'community care-taking function of the police' that allows a certain latitude in determining when the police may tow a vehicle, a fair reading of the relevant portion of the statute indicates that section 3352 is aimed at those vehicles which have been left on the roadways in such a manner as to impede traffic or cause a legitimate safety concern. [2] We can find no authority for the proposition that this section was intended to be boot-strapped onto those sections of the Vehicle Code regarding registration, insurance or other moving traffic violations.

[Footnote 2] The trial court made no finding as to whether Thurman's car posed an actual safety hazard or impeded traffic. Regarding safety, the trial court referenced the general notion of public safety in removing uninsured vehicles from the streets. One officer testified Thurman's car was stopped next to the curb, the other that it was stopped more than a car width from the curb.

*Id.* at 840, discussing 75 Pa.C.S.A. § 3352 (removal of vehicle by or at direction of police).[8]

the normal movement of traffic or constitute a safety hazard.
(c) **Removal to garage or place of safety.**—Any police officer may remove or cause to be removed to the place of business of the operator of a wrecker or to a nearby garage or other place of safety any vehicle found upon a highway under any of the following circumstances:
(1) Report has been made that the vehicle has been stolen or taken without the consent of its owner.
(2) The person or persons in charge of the vehicle are physically unable to provide for the custody or removal of the vehicle.
(3) The person driving or in control of the vehicle is arrested for an alleged offense for which the officer is required by law to take the person arrested before an issuing authority without unnecessary delay.

¶ 20 We agree with the Commonwealth. Moreover, to the extent that *Thurman* could be interpreted as opining that absent a local ordinance adopting Section 6309.2, the police have no authority to impound and tow an unregistered and uninsured vehicle pursuant to their care-taking function, it is disapproved. To the contrary, we think the opposite is true; *i.e.,* that the statute was not intended to trump the traditional community care-taking functions of the police.[9] "Judges are not in a position to second-guess a police officer's decision to tow a vehicle which, in the officer's opinion, may create a traffic hazard. To do so would seriously handicap legitimate traffic-control activities." *United States v. Abbott,* 584 F.Supp. 442, 448 (W.D.Pa. 1984), *affirmed,* 749 F.2d 28 (3rd Cir.(Pa.) 1984).

¶ 21 The courts of this Commonwealth have adopted the principles laid down in *Opperman. Hennigan, supra* at 255, citing *Commonwealth v. Scott,* 469 Pa. 258, 267, 365 A.2d 140, 144–145 (1976). The United States Supreme Court stated in *Opperman:* "In the interests of public safety and as part of what the Court has called 'community caretaking functions,' automobiles are frequently taken into police custody." *Id.* at 368, 96 S.Ct. 3092, citing *Cady v. Dombrowski,* 413 U.S. 433, 441, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973).

To permit the uninterrupted flow of traffic and in some circumstances to preserve evidence, disabled or damaged vehicles will often be removed from the highways or streets at the behest of police engaged solely in caretaking and traffic-control activities. Police will also frequently remove and impound automobiles which violate parking ordinances and which thereby jeopardize both the public safety and the efficient movement of vehicular traffic. The authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge.

*Id.* at 368–369, 96 S.Ct. 3092.

¶ 22 As stated *supra,* the Vehicle Code prohibits driving or moving an unregistered vehicle. 75 Pa.C.S.A. § 1301. In addition, Section 1786 of the Code provides that "Every motor vehicle of the type required to be registered under this title which is operated or currently registered shall be covered by financial responsibility." 75 Pa.C.S.A. § 1786(a). "Any owner of a motor vehicle for which the existence of financial responsibility is a requirement for its legal operation shall not operate the motor vehicle or permit it to be operated upon a highway of this Commonwealth without the financial responsibility re-

---

(4) The vehicle is in violation of section 3353 (relating to prohibitions in specified places) except for overtime parking.

(5) The vehicle has been abandoned as defined in this title. The officer shall comply with the provisions of Chapter 73 (relating to abandoned vehicles and cargos).

75 Pa.C.S.A. § 3352(a), (b), and (c) (footnote omitted).

**9.** We also note that on July 14, 2005, following publication of *Thurman,* Section 6309.2 was amended, in part relevant hereto, to read:

If a motor vehicle or combination for which there is no valid registration or for which the registration is suspended, as verified by an appropriate law enforcement officer, is operated on a highway or trafficway of this Commonwealth, the law enforcement officer shall immobilize the motor vehicle or combination or, in the *interest of public safety, direct that the vehicle be towed and stored by the appropriate towing and storing agent pursuant to subsection (c),* and the appropriate judicial authority shall be so notified.

75 Pa.C.S.A. § 6309.2(a)(2).2005, July 14, P.L. 285, No. 50, § 9, effective in 60 days [Sept. 12, 2005] (emphasis added).

quired by this chapter." 75 Pa.C.S.A. § 1786(f).

¶ 23 Appellant does not dispute that he was required to maintain current registration and insurance on his vehicle as provided by the Code. Obviously, an uninsured vehicle presents a threat to public safety and convenience; should appellant's vehicle have struck another motorist, he would not have insurance to cover the resulting damages. In impounding and towing appellant's vehicle, Officer Hilley was acting pursuant to standard police procedure. Appellant's vehicle jeopardized the public safety and Officer Hilley was authorized to impound the vehicle pursuant to his traditional community care-taking function, regardless of whether or not the City of Pittsburgh had elected to adopt Section 6309.2.

¶ 24 Appellant also argues that the purpose of the search was investigatory, and that Officer Hilley purposely stopped him in a no-parking zone so that his vehicle would have to be immediately towed.

> An inventory takes place when it is not coupled with the intent of discovering evidence of a crime. The inventory is conducted not for the purpose of uncovering incriminating evidence, but for the purpose of safeguarding the contents of the vehicle for the benefit of both the owner and the police.

*Commonwealth v. Brandt*, 244 Pa.Super. 154, 366 A.2d 1238, 1241 (1976), citing *Opperman, supra.*

> It is well established that a valid inventory search is not designed to uncover evidence of a crime. In *Opperman*, the Supreme Court established that an inventory search is only excepted from the warrant requirement or probable cause where it is motivated by a desire to safeguard the contents of the vehicle,

and not by a design to uncover incriminating evidence.

*Commonwealth v. Germann*, 423 Pa.Super. 393, 621 A.2d 589, 594 (1993), citing *Opperman, supra* (footnote omitted). " '[M]otive' is the sole factor which distinguishes a criminal investigatory search from a noncriminal inventory search of an automobile. A questionable impoundment is one factor of circumstantial evidence of an improper motive." *Id.* at 595, citing *Abbott, supra.*

¶ 25 We find no evidence to support appellant's contention. Officer Hilley testified that appellant's vehicle was stopped in the middle of the roadway such that it constituted a traffic hazard; that the particular street on which appellant's vehicle was stopped did not permit parking on either side; and that there was a great amount of snow on the road, preventing appellant from pulling onto the sidewalk so as not to interfere with traffic. (Notes of testimony, 1/26–27/00 at 42, 47.) Officer Hilley also testified that in the case of a recovery of a stolen vehicle, the owner is notified and given an opportunity to come and claim it; however, department policy in the case of an unregistered/uninsured vehicle is to impound it if it cannot be legally parked. *(Id.* at 13, 42, 45.) Officers are not permitted to move an unregistered/uninsured vehicle to a safe area where it can be legally parked. *(Id.* at 13.) In impounding appellant's vehicle and conducting the required inventory search, Officer Hilley was merely following established departmental policy; the search was not designed to uncover evidence of a crime.

¶ 26 Appellant also contends that Officer Hilley had an improper motive for the impoundment of his vehicle and subsequent inventory search because Officer Hilley was aware that appellant was wanted for questioning by homicide detectives.

Officer Hilley testified at the suppression hearing that he received a dispatch describing appellant's vehicle and instructions to detain the driver for questioning by homicide detectives. *(Id.* at 5.) There was no testimony that Officer Hilley knew anything in particular about the case, or even why detectives wished to question the driver; *e.g.,* whether he was a suspect or a material witness. Officer Hilley testified that he knew detectives were interested in the driver, but not necessarily the vehicle itself.[10] *(Id.* at 40.) Based on the foregoing, we conclude that Officer Hilley's motives were not improper and that the purpose for the inventory search was not to uncover incriminating evidence.

¶ 27 Affirmed.

¶ 28 GANTMAN, J. concurs in the result.

¶ 29 KLEIN, J. files a Concurring and Dissenting Opinion which is joined by GANTMAN, J.

## CONCURRING AND DISSENTING OPINION BY KLEIN, J.:

¶ 1 I agree that Henley's judgment of sentence should be affirmed, and agree that because the vehicle was stopped in a no-parking area where there were also mounds of snow, it was necessary to tow the car. Therefore, the public safety exception applies and it was appropriate to inventory the car before towing it.

¶ 2 However, I do not believe the outcome is dependent in any way on a *Thur-*

*man*[11] analysis. I believe it is improper to overturn a panel decision in *dicta* when that analysis is not at all necessary to the decision. There was no claim in *Thurman* that the car was stopped in an impermissible place and it was necessary to tow the car and therefore conduct an inventory search. Therefore I dissent to that portion of the majority opinion.

¶ 3 *Thurman* does not stand for the proposition that local governments no longer have the ability to tow a vehicle pursuant to their "community care-taking function." Rather, *Thurman* dealt with a specific issue of whether a local police department may, on its own authority, adopt a regulation requiring the police to tow any vehicle that is not properly registered and/or insured. *Thurman* held that a local police department cannot institute such a policy because the legislature has specifically provided for the manner in which such towing is to take place, *see* 75 Pa.C.S. § 6309.2. *Thurman* was not a wholesale attack on the common law ability for the police to exercise their community caretaking responsibilities regarding traffic control. Rather, *Thurman* prevents the police from improperly towing a non-registered vehicle *parked appropriately,* solely because it is unregistered and/or uninsured, without a) first obtaining authority from the proper local governmental unit; and b) observing and honoring certain fundamental due process rights.

¶ 4 I fully agree with the majority that section 6309.2 was not intended to trump

---

**10.** The record reflects that the .38 caliber revolver found under the driver's seat was not the murder weapon. Appellant claimed it was the victim's gun. (Notes of testimony, trial, 11/14–16/00 at 195.) During his interview with Detective Logan, appellant stated that the gun he used to kill Swan was still in the vehicle. *(Id.* at 196.) Appellant described the location of the gun. *(Id.)* At the conclusion of the interview, a .40 caliber Glock

semi-automatic handgun was recovered from the vehicle, on the passenger side as described by appellant. *(Id.)* Expert testimony at trial established that this was the weapon used to murder Swan. *(Id.* at 244.)

**11.** *Commonwealth v. Thurman,* 872 A.2d 838 (Pa.Super.2005), appeal denied, 585 Pa. 688, 887 A.2d 1241 (2005).

the traditional care-taking functions of the police. However, prior to the amendment, the police did not have the ability to tow any vehicle simply by virtue of it being unregistered and/or uninsured, if the vehicle did not pose any other traffic or safety related problem. But the fact is that towing a vehicle not creating a safety hazard solely because it is unregistered and/or uninsured was not covered by any other statute. The care taking functions are not implicated solely by virtue of the car being unregistered.[12]

¶ 5 Section 6309.2 provided that a car, even parked legally, can be towed if proper procedures are followed. To have the right to tow a car not creating a safety problem, the legislature required any municipality (other than Philadelphia where adoption of the section was automatic) to simply formally adopt the state statute. Under the state statute, there will be certain due process safeguards before a municipality can tow a car not creating a safety hazard and there will be uniformity in its application. It makes no sense to believe that a local police department can, independently, adopt its own policy that does not observe the due process principles embodied in the section. That would mean that the police department would be *restricted* in towing cars not creating a public safety problem if they adopted the act. The legislature is presumed not to intend an absurd result, and that would be absurd.

¶ 6 If a local government believes it is in the best interests of the community to tow unregistered and uninsured vehicles solely because those vehicles are unregistered and uninsured, then the municipality should adopt section 6309.2 and provide the due process protections the legislature requires.

¶ 7 *Thurman,* however, is not implicated in the situation presented in the current case. The factual situation present here fully supports the exercise of the traditional care-taking functions, as well as the statutory authority to tow the vehicle under 75 Pa.C.S. § 3352.

¶ 8 Here, Henley was pulled over, in part, because the registration sticker on his vehicle was expired.[13] Henley was pulled over in a no-parking zone and in an area where snow prevented the vehicle from being safely parked outside the flow of traffic.[14] Both being in a no parking zone and the fact that the car could not be pulled to the curb, safely out of the way of other traffic, are legitimate reasons to tow a vehicle under 75 Pa.C.S. § 3352(b), (c)(4). Thus, Henley's vehicle was *not* towed solely because it was unregistered and uninsured. It was towed because it was in a no parking zone and because it impeded the flow of traffic. Because the car was legitimately towed, the subsequent search of the vehicle was similarly proper.

¶ 9 Therefore, while I agree with the result, I believe that *Thurman* is not implicated and should remain good law. I

---

12. As an example, the police see a car pull out of a private driveway in a typical suburban setting. The car's registration sticker is out of date. The police immediately stop the car and the car is pulled over, out of traffic's way and directly in front of the vehicle owner's house. Without *Thurman* and the requirement that the police follow procedures of section 6309.2, the police, under the majority's view, could simply tow the vehicle under the "care-taking" rubric, even if the owner

had proof of registration and insurance mere feet away inside the house.

13. Henley was also wanted for questioning regarding a murder.

14. In spite of Henley's allegation, there is no indication, and importantly no finding, that the police pulled Henley over in this particular spot simply as a pretext to tow.

think it well may remain good law because most of the majority's analysis is *dicta.*

