## Commonwealth v. Husky

C.P. of Lehigh County, no. CR-848-2010.

*Jeffrey S. Dimmig, deputy district attorney,* for Commonwealth.
*Karen J. Schular,* for defendant.

STEINBERG, *J.,* August 3, 2010—The defendant, Ronald Husky, is charged with possession with intent to deliver a controlled substance,[1] possession of drug paraphernalia,[2] and driving without a license.[3] Heroin was retrieved from the defendant's vehicle after it was lawfully stopped for blocking an alleyway in the 200 block of North 12th Street in Allentown. Additionally, heroin

1. 35 P.S. §780-113(a)(30).
2. 35 P.S. §780-113(a)(32).
3. 75 Pa.C.S. §1501(a).

and a hypodermic needle were seized from the defendant after he was taken into custody.

On May 17, 2010, a "motion to suppress" was filed on behalf of the defendant alleging the following: (1) the "stop, search and seizure was conducted without reasonable suspicion or probable cause;" (2) the "search of the defendant's vehicle was conducted without a warrant," and (3) "the search and seizure of the defendant and his vehicle was overbroad."[4] The defendant maintains that, because of those constitutional missteps, the heroin and needle should be suppressed. A hearing on the motion to suppress was held on June 8, 2010.

The Commonwealth presented the testimony of Officer Kyle French and Sergeant Eric Heicklen at the suppression hearing. Officer French testified that at approximately 7 p.m., he was dispatched to the 200 block of 12th Street in Allentown regarding a disturbance involving a bald white male in a white vehicle who was upset about the loss of money or drugs. The original call was received from an anonymous source.

Officer French, who was in a patrol vehicle driven by Officer Jack DeWalt, observed a vehicle matching the description provided in the dispatch parked on 12th Street. The vehicle, a white Dodge Durango, was partially blocking Emmett Street, and preventing other vehicles' from proceeding without interference.

Officer DeWalt turned the patrol vehicle around, and as he did so, the Durango pulled out and proceeded north on 12th Street. The patrol vehicle lights were then activated and a vehicle stop was initiated. The officers ex-

---

4. Motion to suppress, ¶¶12,13,14.

ited their patrol vehicle, Officer French approached the passenger side, and Officer DeWalt the driver's side. Two males were inside the vehicle, the defendant, who was the driver, and Collin Freitas, a bald white male. Officer DeWalt asked the defendant for his identification, but the defendant was unable to provide any documentation. The defendant was then asked to write down his name and date of birth, and when that information was checked, it was learned that the defendant's license was suspended. As a result, both occupants were asked to step out of the vehicle where they were frisked. No weapons were discovered.

Sergeant Eric Heicklen, who also observed the Durango blocking the alleyway, arrived and learned that the defendant was not permitted to operate the vehicle. He permitted the defendant to contact his wife to drive the vehicle, but attempts to reach her proved unsuccessful. As a result, in preparation to tow the vehicle, an inventory search of the vehicle was conducted. Two bundles of heroin were discovered in the center console by Sergeant Heicklen. Both the defendant and Mr. Freitas were then arrested and searched. A bag of heroin was found in the defendant's left front pants pocket, and later at headquarters, the hypodermic needle was discovered on him.

## DISCUSSION

It is well-established that a forcible stop of a motor vehicle by the police constitutes a seizure triggering the constitutional protections of the Fourth Amendment. *Commonwealth v. Clinton,* 905 A.2d 1026, 1030 (Pa. Super. 2006) citing *Commonwealth v. Campbell,* 862 A.2d 659, 663 (Pa. Super. 2004). See *Commonwealth v.*

*Knotts,* 444 Pa. Super. 60, 64, 663 A.2d 216, 218 (1995) ("When police stop a vehicle in this Commonwealth for investigatory purposes, the vehicle, and its occupants, are considered 'seized' and the seizure is subject to constitutional constraints."). Therefore, the decision by the police to stop the Durango operated by the defendant constituted a seizure, and requires this court to evaluate the lawfulness of that seizure. In other words, did the police have either probable cause or reasonable suspicion to initiate a stop of the vehicle.

Probable cause exists if the facts and circumstances within the knowledge of the police at the time of the stop are sufficient to justify a person of reasonable caution in the belief that an offense has been or is being committed. *Commonwealth v. Luv,* 557 Pa. 570, 575, 735 A.2d 87, 90 (1999) (citing *Commonwealth v. Gibson,* 536 Pa. 123, 130, 638 A.2d 203, 206 (1994)); see *Commonwealth v. Oppel,* 754 A.2d 711, 713 (Pa. Super. 2000). In order to establish reasonable suspicion, the police "must articulate specific observations which, in conjunction with reasonable inference derived from those observations, led [them] reasonably to conclude, in light of [their] experience, that criminal activity was afoot and that the person stopped was involved in that activity." *Commonwealth v. Bennett,* 827 A.2d 469, 477 (Pa. Super. 2003). The information necessary to establish "reasonable suspicion" is less in terms of quantity and content than what would be required to establish probable cause. *Commonwealth v. Cook,* 558 Pa. 50, 59, 735 A.2d 673. 678 (1999); *Commonwealth v. Shine,* 784 A.2d 167, 170 (Pa. Super. 2001). Both, however, require an evaluation of the totality of the circumstances. *Commonwealth v. Zhahir,* 561 Pa. 545, 552, 751 A.2d 1153, 1156 (2000); *Commonwealth v. Bryant,* 866 A.2d 1143 (Pa. Super. 2005).

Police can initiate an investigatory stop when they have reasonable suspicion of a Vehicle Code violation. *Commonwealth v. Chase,* 599 Pa. 80, 102, 960 A.2d 108, 120 (2008); *Commonwealth v. Muhammed,* 992 A.2d 897, 900 (Pa. Super. 2010); *Clinton,* 905 A.2d at 1030. Section 6308 of the Vehicle Code provides:

"Whenever a police officer is engaged in a systematic program of checking vehicles or drivers or has reasonable suspicion that a violation of this title is occurring or has occurred, he may stop a vehicle, upon request or signal, for the purpose of checking the vehicle's registration, proof of financial responsibility, vehicle identification number or engine number or the driver's license, or to secure such other information as the officer may reasonably believe to be necessary to enforce the provisions of this title." 75 Pa.C.S. §6308(b). (emphasis added)

In that regard, the constitution does not prevent the police from "stopping and questioning motorists when they witness or suspect a violation of traffic laws, even if it is a minor offense." *Chase,* 960 A.2d at 113.[5] "Reasonable suspicion sufficient to stop a motorist must be viewed from the standpoint of an objectively reasonable police officer . . . A finding of reasonable suspicion does

---

5. The court in Chase utilized various federal cases, including the following minor violations to demonstrate that reasonable suspicion is sufficient to justify a vehicle stop: *United States v. Booker,* 496 F.3d 717, 721-22 (D.C. Cir. 2007) (reasonable suspicion existed to investigate placement of temporary tag on vehicle); *United States v. Delfin-Colina,* 464 F.3d 392, 394-95 (3d Cir. 2006) (reasonable suspicion to investigate whether necklace was illegally hanging from rearview mirror); see also, *Muhammed,* 992 A.2d at 899 (reasonable suspicion to stop defendant's car where officer observed defendant's center brake light fail to illuminate upon application of brakes).

not demand a meticulously accurate appraisal of the facts. Indeed, even stops based on factual mistakes generally are constitutional if the mistake is objectively reasonable." *Id.* (internal citations and quotation marks omitted)

Here, the initial police response was due to an anonymous call about a bald man in a white car crying over spilt money or drugs. Upon their arrival, the officers did observe a white Durango, which was blocking an intersection in violation of 75 Pa.C.S. §3353(a)(iii). As a result, the police commenced an investigation into the facts and circumstances of the dispatch and the Vehicle Code violation.

The information the officers had been provided by dispatch was limited, and while not sufficient to conclude that criminal activity was afoot, it did not preclude them from conducting an investigation. *Commonwealth v. Brown,* 996 A.2d 473, 477 (Pa. 2010) quoting *Adams v. Williams,* 407 U.S. 143, 147 (1972) ("Informants tips like all other clues and evidence coming to a policeman on the scene, may vary greatly in their value and reliability. One simple rule will not cover every situation. Some tips, completely lacking indicia of reliability, would either warrant no police response, or require *further investigation* before a forcible stop of a suspect would be authorized). (emphasis added)

Furthermore, although the anonymous nature of the information does not preclude a finding of "reasonable suspicion," prior to such a finding an independent police investigation must corroborate that the information has "sufficient indicia of reliability." *Id.* "[T]here are situations in which an anonymous tip, suitably corroborated, exhibits 'sufficient indicia of reliability' to provide rea-

sonable suspicion . . . ." *Alabama v. White,* 496 U.S. 325, 327 (1990). One of those situations is where the anonymous caller demonstrates inside knowledge. *Id.* at 332.

In *Commonwealth v. Hawkins,* 547 Pa. 652, 656-57, 692 A.2d 1068, 1070-71 (1997) the suitability of the corroboration was explained in the following manner:

"If the police respond to an anonymous call that a particular person at a specified location is engaged in criminal activity, and upon arriving at the location see a person matching the description but nothing more, they have no certain knowledge except that the caller accurately described someone at a particular location. As the United States Supreme Court observed in *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), the fact that a suspect resembles the anonymous caller's description does not corroborate allegations of criminal conduct, for anyone can describe a person who is standing in a particular location at the time of the anonymous call. Something more is needed to corroborate the caller's allegations of criminal conduct. The fact that the subject of the call was alleged to be carrying a gun, of course, is merely another allegation, and it supplies no reliability where there was none before. And since there is no gun exception to the *Terry* requirement for reasonable suspicion of criminal activity, in the typical anonymous caller situation, the police will need an independent basis to establish the requisite reasonable suspicion."

The initial police response here was only able to corroborate the color of the vehicle reported by the anonymous caller. Due to the limited anonymous information, more investigation was required to justify a stop of the Durango. *Commonwealth v. Fell,* 901 A.2d 542, 545 (Pa.

Super. 2006) (inside information—"a specific familiarity with [the person's] affairs provides corroboration for reasonable suspicion."); *Commonwealth v. Stevenson,* 832 A.2d 1123 (Pa. Super. 2003) (Unsubstantiated radio broadcast that a person is engaged in narcotics activity does not provide requisite basis for investigatory detention); *Commonwealth v. Hayward,* 756 A.2d 23 (Pa. Super. 2000) (Tip from anonymous pedestrian that a tall man in the park was brandishing a weapon did provide reasonable suspicion).

The anonymous information also lacked the urgency associated with an emergency. *McNeil v. City of Easton,* 694 F.Supp. 375, 389 (E.D. Pa. 2010) (Gardner, J) ("An anonymous 911 reporting an ongoing emergency is entitled to a 'higher degree of reliability and requires a lesser showing of corroboration than a tip that alleges general criminality. Thus, when an emergency is reported by an anonymous caller, the need for immediate action may outweigh the need to verify the reliability of the caller.'"). (citations omitted) The nature of the call in this case, while reflecting an individual who was "freaking out"[6] over lost money or drugs, did not suggest anything other than anger. No one was in apparent danger because of the bald man's rant. Therefore, the anonymous call only justified further investigation but not a seizure.

However, the Vehicle Code violation provided a lawful basis to detain the occupants of the Durango. Even though the Vehicle Code violation was a minor offense, and not the only reason for stopping the vehicle, it provided sufficient justification for bringing the Durango to

---

6. Affidavit of probable cause, ¶2.

a halt. In other words, the motivations of the officers for stopping the vehicle are not subject to constitutional inquiry as long as they can "articulate a reasonable suspicion of a Vehicle Code violation. . . ." Chase, 960 A.2d at 120. See *Whren v. U.S.,* 517 U.S. 806, 813 (1996); *U.S. v. Pipes,* 125 F.3d 638, 640 (8th Cir. 1997); *Commonwealth v. Henley,* 909 A.2d 352, 358 (Pa. Super. 2006) (Officer who pulled behind suspect's vehicle based on radio broadcast to stop vehicle, conducted a valid traffic stop based upon his observation of an expired registration sticker on license plate). Both Officer French and Sergeant Heicklen testified that the Durango was stopped in a way that blocked the ingress and egress of the roadway. Therefore, the officers had reasonable suspicion to stop the vehicle to determine whether the actions of the driver were a violation or were "necessary to avoid conflict with other traffic or to protect the safety of any person or vehicle." 75 Pa.C.S. §3353(a).

Once the vehicle was lawfully stopped, Officer DeWalt was permitted to ask the defendant for his identification. Inquiries concerning identification do not implicate the Fourth Amendment. *Commonwealth v. Campbell,* 862 A.2d 659, 664 (Pa. Super. 2004) ("One's name is subject to repeated disclosure every day, and we find identifying oneself to be a minimal intrusion."). The defendant did not possess any identification, but he did write down his name and date of birth. The officers, with this information, were able to learn that the defendant's license was suspended. As a result, the two occupants were asked to exit the vehicle. Police may request both drivers and passengers to "alight" from a lawfully stopped car without reasonable suspicion that criminal activity is afoot. *Commonwealth v. Pratt,* 930 A.2d 561, 564 (Pa. Super. 2007).

The defendant, due to his license suspension, was not permitted to operate the vehicle, and unless someone else could drive the vehicle, it would have to be towed. Sergeant Heicklen permitted the defendant to contact his wife to drive the vehicle, but attempts proved unsuccessful. A decision was then made to tow the vehicle, but before doing so, an inventory search of the vehicle was necessary. The propriety of an inventory search has been explained as follows:

"In determining whether a proper *inventory search* has occurred, the first inquiry is whether the police have lawfully impounded the automobile, *i.e.,* have lawful custody of the automobile . . . The second inquiry is whether the police have conducted a reasonable *inventory search.*" *Commonwealth v. Thompson,* 2010 WL 2795027 (Pa. Super.) quoting *Commonwealth v. Henley,* 909 A.2d 352, 359 (Pa. Super. 2006).

"The authority of the police to impound vehicles derives from the police's reasonable community care-taking functions. . . . Such functions include removing disabled or damaged vehicles from the highway, impounding automobiles which violate parking ordinances (thereby jeopardizing public safety and efficient traffic flow), and protecting the community's safety." *Id.* The community care-taking functions "coexists" with 75 Pa.C.S. §6309.2, which in pertinent part provides:

"*(a) General rule.*—Subject to subsection (d), the following shall apply:

"(1) If a person operates a motor vehicle or combination on a highway or trafficway of this Commonwealth while the person's operating privilege is suspended, revoked, canceled, recalled or disqualified or where the

person is unlicensed, as verified by an appropriate law enforcement officer in cooperation with the department, the law enforcement officer shall immobilize the vehicle or combination or, in the interest of public safety, direct that the vehicle be towed and stored by the appropriate towing and storage agent pursuant to subsection (c), and the appropriate judicial authority shall be so notified."

In light of the defendant's license suspension, the Durango was lawfully in the custody of the police. Furthermore, under Allentown Police policy 4.3.7(A) "[v]ehicles that are operated by unlicensed or suspended operators shall be towed."[7]

The subsequent inventory search was reasonable if it [was] conducted pursuant to reasonable standard police procedures and in good faith and not for the sole purpose of investigation. *Id.* at *4. "Inventory searches serve one or more of the following purposes: (1) to protect the owner's property while it remains in police custody; (2) to protect the police against claims or disputes over lost or stolen property; (3) to protect the police from potential danger; and (4) to assist the police in determining whether the vehicle was stolen and then abandoned." *Henley,* 909 A.2d at 359.

Sergeant Heicklen's decision to permit the defendant to contact his wife demonstrates that the actions of the police were in good faith and not solely for investigatory purposes. The defendant could not take control of the vehicle and was unable to contact anyone who was authorized to do so. *Commonwealth v. Woody,* 451 Pa.

7. See Allentown Police Department general order 4.3, which governs "Towing, locked vehicles, abandoned vehicles, inventory searches."

Super. 324, 328, 679 A.2d 817, 819 (1996) ("[s]ince no one was available to move the car, which was blocking the street, the police were required to take custody of the vehicle and an inventory search was proper."). The inventory search also complied with the Allentown Police Policy.[8] The policy of the Allentown Police Department, which has the stated intent "to list all valuable items to safeguard them for the owner." is reasonable.

Sergeant Heicklen discovered the heroin in the center console. The decision to inventory the console was reasonable because valuables are often stored in a console to keep them hidden from view. See *South Dakota v. Opperman,* 428 U.S. 364 (1976) (inventory search was reasonable where marijuana found in unlocked glove compartment); *Henley,* 909 A.2d at 356 (discovery of .38 caliber revolver under driver's seat during inventory search was reasonable). It would be incongruous to conduct an inventory search where one of its purposes is to protect the owner's property, and then not search areas where owner's safeguard their property. Items in plain view, a glove compartment, or console are all within the scope of a reasonable inventory search.

The reasonableness of an inventory search has been guided by the following requirements:

"[T]he Commonwealth must show that the search was in fact an inventory search pursuant to the objectives laid down in *Opperman*[.] The hearing judge must be convinced that the police intrusion into the automobile was for the purpose of taking an inventory of the car and not for the purpose of gathering incriminating evidence.

---

8. See general order 4.3 section 4.3.6.

Those facts and circumstances which the hearing judge must consider include the scope of the search, the procedure utilized in the search, whether any items of value were in plain view, the reasons for and nature of the custody, the anticipated length of the custody, and any other facts which the court deems important in its determination. If, after weighing all the facts and circumstances, the court is of the opinion that it was an inventory search of an automobile lawfully in police custody, then any evidence seized as a result of this 'reasonable' inventory search is admissible. If, on the other hand, the hearing judge determines that the Commonwealth has not shown that the search was part of the police caretaking function rather than their investigative function, the probable cause-warrant standard must be used for determining reasonableness." *Commonwealth v. Hennigan,* 753 A.2d 245, 255-256 (Pa. Super. 2000), quoting *Commonwealth v. Brandt,* 244 Pa. Super. 154, 162-63, 366 A.2d 1238, 1241 (1976).

The good-faith actions of the police demonstrate that the inventory search was part of the police care-taking function rather than their investigative function. The discovery of the heroin in the console was a product of the inventory search, not part of a drug investigation. If the defendant was operating the Durango with a license, no inventory search would have been required or justified.

Finally, after the discovery of the heroin in the console, the defendant was arrested and searched leading to the discovery of additional heroin and later the hypodermic needle. The search incident to arrest was proper. "[a] warrantless search incident to a lawful arrest is *reason-*

*able,* and no justification other than that required for the arrest itself is necessary to conduct such a search. . . . Stated another way, in all cases of lawful arrests, police may fully search the person incident to the arrest." *Commonwealth v. Ingram,* 814 A.2d 264, 272 (Pa. Super. 2002). (emphasis in original) (citation omitted)

For all the foregoing reasons, the police had reasonable suspicion to stop the defendant's vehicle and to, thereafter, seize the heroin found during a search of the defendant's vehicle. With the discovery of the heroin inside the vehicle, the police had probable cause to arrest the defendant and to conduct a search of his person.

## ORDER

And now, August 3, 2010, upon consideration of the defendant's "motion to suppress," and after a hearing thereon; it is hereby ordered that the "motion to suppress" is denied.