J-A12027-24
J-A12028-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| Appellant | : | |
| v. | : | |
| SHAQUIL BRINSON | : | No. 898 EDA 2023 |

Appeal from the Order Entered March 3, 2023
In the Court of Common Pleas of Delaware County Criminal Division at
No(s):  CP-23-CR0003532-2021

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| Appellant | : | |
| v. | : | |
| NAASIR FLAMER | : | No. 473 EDA 2023 |

Appeal from the Order Entered January 9, 2023
In the Court of Common Pleas of Delaware County Criminal Division at
No(s):  CP-23-CR0003533-2021

BEFORE:   PANELLA, P.J.E., KING, J., and STEVENS, P.J.E.*

DISSENTING MEMORANDUM BY STEVENS, P.J.E.:**FILED OCTOBER 25, 2024**

Appellees' suppression motions should have been denied. While the

Majority offers a thoughtful analysis, I conclude that, assuming, *arguendo*, the

officer prolonged the traffic stop without justification, and the search warrant

_____

* Former Justice specially assigned to the Superior Court.

was invalid, the officer would have been permitted to tow the uninsured vehicle and conduct an inventory search pursuant thereto such that the evidence would have been inevitably discovered.

Therefore, as I would reverse the suppression court's orders granting Appellees' motions to suppress the physical evidence seized from the vehicle, I respectfully dissent.

It's undisputed that Colwyn Borough Police Officer Michael Brodzinski was the sole testifying witness at the suppression hearing. The suppression court specifically indicated it found Officer Brodzinski to be credible. Suppression Court Opinion, filed 2/27/23, at 4; Suppression Court Opinion, filed 3/3/23, at 4.

Officer Brodzinski testified that, while on patrol on May 31, 2021, at approximately 7:30 p.m., he observed a white, two-door Honda fail to stop for a stop sign. N.T., 1/19/22, at 29. Accordingly, Officer Brodzinski effectuated a traffic stop of the Honda. *Id.* The officer specifically testified the Honda stopped "in the middle of the street," and the officer stopped his marked police vehicle behind the Honda. *Id.* at 60. The officer testified he wasn't sure if the Honda could have pulled over to a safe spot since there were cars parked on the side of the street. *Id.*

Officer Brodzinski exited his police vehicle and approached the passenger side of the Honda, which had the window rolled down. *Id.* at 30. Two men were inside of the Honda; namely, Appellee Nassir Flamer was in

- 2 -

the driver's seat while Appellee Shaquil Brinson was in the passenger's seat. *Id.* at 30-31. Officer Brodzinski testified he had prior contact with Appellee Brinson approximately one month earlier, which resulted in drug charges against Appellee Brinson. *Id.* at 44. Officer Brodzinski asked Appellee Flamer for his driver's license, registration, and insurance. *Id.* at 32. Appellee Flamer provided his driver's license and registration; however, he "was unable to provide an insurance card." *Id.*

Officer Brodzinski testified that, when drivers have no insurance, the police "commonly tow their vehicle," but police have some "discretion." *Id.* He specified that "there's certain things that we tow for, [but] there's no certain procedure of how it gets towed." *Id.* at 59. Officer Brodzinski clarified that the Colwyn Borough Police Department has a procedure to follow when police are going to tow a vehicle. *Id.* at 75. Specifically, before a vehicle is towed, the police call for the tow truck and then conduct "an inventory search" on the vehicle. *Id.* The officer explained an "inventory search is a search for valuables, so when [the vehicle] goes to a tow yard,…the vehicle owner can't say that anything was stolen out of the vehicle." *Id.* at 75-76. He testified an inventory search is something that he normally does on every vehicle that is going to be towed, and it is "department policy." *Id.* at 76. During the inventory search, the police look everywhere a person could put something valuable. *Id.*

Officer Brodzinski testified Appellee Flamer seemed "excitedly nervous," and based on his training and experience, Appellee Flamer's demeanor seemed "odd." *Id.* at 33. Meanwhile, Appellee Brinson "kept his head down the entire time and stared at the floorboard." *Id.* at 34.

Officer Brodzinski asked Appellee Flamer to exit the Honda and "come back to [the police] vehicle so [the officer] could talk to him at the passenger side window [of the police vehicle]." *Id.* Appellee Flamer complied, and, while the officer sat in the driver's seat of the police vehicle checking Appellee Flamer's driver's license, Appellee Flamer stood by the passenger side window. *Id.* Officer Brodzinski testified Appellee Flamer "was very nervous at the window. He was pacing back and forth." *Id.*

The officer asked Appellee Flamer where he was headed, and he responded he was going to a barbecue in southwest Philadelphia. *Id.* Officer Brodzinski asked Appellee Flamer why he was so nervous, and he responded, "I'm not nervous, bro. I have nothing illegal in my car. I have nothing to be nervous for." *Id.* at 35. Officer Brodzinski indicated that, up to this point, he had not mentioned to either of the Honda's occupants that he believed the vehicle contained any illegal contraband. *Id.* The officer then asked Appellee Flamer for consent to search the Honda, and he replied, "No, bro. I don't have any weed in the car, you know, there's no reason for you to search it." *Id.* Officer Brodzinski indicated that, up to this point, he had not mentioned to either occupant anything about "weed or marijuana." *Id.*

After this conversation with Appellee Flamer, the officer asked Appellee Brinson, who had yet to make eye contact with the officer, to step out of the Honda. *Id.* at 36. The officer noted Appellee Brinson was very nervous with his hands shaking. *Id.* at 45. As Appellee Brinson exited the Honda, he "became aggravated at [the officer] and said that [he] was doing it for a racial thing." *Id.* Nevertheless, Appellee Brinson sat on the curb while Appellee Flamer sat on a nearby ledge. *Id.* at 36. Neither man was placed in handcuffs. *Id.*

Officer Brodzinski informed Appellee Flamer that he was going to request the K-9 Unit to sniff for illegal narcotics, and in response, Appellee Flamer said, "go ahead, you can get the dog." *Id.* at 37. Appellee Flamer then spontaneously stated that he "just got out of jail for a parole violation,…[and] he doesn't want to go back." *Id.* at 38. He began showing the officer pictures of his family, and he announced that "this is why he stays out of jail[.]" *Id*.

The officer explained:

[Appellee] Flamer was nervous, he was excited, he was pacing back and forth, showing pictures of the family and kids. It's almost an empathy thing that I've commonly ran into over my career is that they use that to kind of an advantage of trying to get somebody to feel bad and not go forward on what's happening.

*Id.*

Officer Brodzinski clarified that he called dispatch for the K-9 Unit approximately 10 to 15 minutes after he stopped the Honda, and the K-9 Unit

arrived on the scene approximately 20 to 25 minutes after he called dispatch. *Id.* at 40-41. During the sniff of the vehicle, the dog "indicated on the vehicle driver side and passenger side." *Id.* at 40.

The officer testified that, at this point, he called for a tow truck. *Id.* at 41. Specifically, the relevant exchange occurred between the assistant district attorney and the officer:

> Q: You said that the car was towed?
> A: Yes.
> Q: Why was the car towed?
> A: To request a search warrant.
> Q: Why were you going to request a search warrant?
> A: For the dog's indication on the vehicle.
> Q: Was there any other reason to tow the car?
> A: Yes, we could have towed it for insurance reasons.
> Q: Did you ever get valid insurance on that car?
> A: No.

*Id.*

Officer Brodzinski clarified that the only reason he did not request a tow truck for lack of insurance, and conduct an inventory search pursuant thereto, was "because [he] knew [he] was applying for a search warrant." *Id.* at 77. After the Honda was towed to the police station, the officer received and executed a search warrant. *Id.* at 53. He found a handgun and pills in the vehicle. *Id.*

Based on the aforementioned, the suppression court granted Appellee Brinson's and Appellee Flamer's motions to suppress the evidence seized from

the Honda. Initially, the suppression court held Officer Brodzinski lawfully stopped the Honda, properly requested that Appellee Flamer provide his driving documents, and properly ordered the occupants out of the Honda. **See** Suppression Court Opinion, filed 2/27/23, at 4-5; Suppression Court Opinion, filed 3/3/23, at 4-5. However, the suppression court concluded the officer did not have sufficient justification to prolong the traffic stop beyond its "mission to address the traffic violation that warranted the stop and attend to related safety concerns." **Id.** at 5.

Moreover, in its Rule 1925(a) opinion, the suppression court further explained:

> [T]he traffic stop should have concluded before Officer Brodzinski called for the K-9 Unit. The initial purpose of the stop, which was to issue a ticket for failure to stop at a stop sign, reasonably should have been completed by the time Officer Brodzinski requested the K-9 Unit, which occurred 10-15 minutes later. Consequently, Officer Brodzinski was not justified in prolonging the stop behind the necessary duration unless he had probable cause. There was neither probable cause nor reasonable suspicion to extend the traffic stop for up to 30 minutes for a K-9 search. [Appellees'] nervous behavior alone did not provide sufficient basis to warrant the search by the K-9 Unit.

Suppression Court Opinion, filed 6/22/23, at 5-6.

Notably, the suppression court did not fully analyze whether, irrespective of the prolonged detention that ultimately resulted in Officer Brodzinski applying for and executing a search warrant, the Honda would have been towed for lack of insurance, and, thus subject to an inventory search wherein the discovery of the evidence was inevitable.

On appeal, *inter alia*, the Majority relevantly concludes that "Officer Brodzinski presented evidence solely that the evidence **could** have been lawfully discovered, not that it **would** have been lawfully discovered pursuant to a constitutionally sound inventory search." Majority Memorandum at 22 (bold in original). Thus, in affirming the suppression court, in addition to holding the officer lacked reasonable suspicion to extend the traffic stop and request the K-9 Unit, the Majority rejects the Commonwealth's claim of inevitable discovery pursuant to a proper inventory search. After a careful review, I respectfully disagree with the Majority.

There is no dispute Officer Brodzinski lawfully stopped the Honda. Also, Officer Brodzinski properly determined that Appellee Flamer was operating the Honda without valid insurance. ***Commonwealth v. Malloy***, 257 A.3d 142, 149-50 (Pa.Super. 2021) (holding police officers are allowed to make "incidental inquiries aimed at ensuring the safe and responsible operation of vehicles on the highway" such as inspecting the vehicle's proof of insurance during a routine traffic stop). Thus, Officer Brodzinski was legally permitted to tow the Honda and, pursuant to department policy, would have conducted an inventory search prior thereto. Therefore, because there is no dispute the evidence would have been found during a valid inventory search, I conclude the suppression court erred in suppressing the evidence.

Regarding inevitable discovery, this Court has held as follows:

> [E]vidence which would have been discovered [is] sufficiently purged of the original illegality to allow admission of

- 8 -

the evidence…[I]mplicit in this doctrine is the fact that the evidence would have been discovered despite the initial illegality.

If the prosecution can establish by a preponderance of the evidence that the illegally obtained evidence ultimately or inevitably would have been discovered by lawful means, the evidence is admissible. The purpose of the inevitable discovery rule is to block setting aside convictions that would have been obtained without police misconduct.

*Commonwealth v. Bailey*, 986 A.2d 860, 862 (Pa.Super. 2009) (quotation omitted).[1]

In this matter, the Commonwealth argues the police were legally permitted to tow the Honda because the driver (Appellee Flamer) did not have proof of valid insurance, the officer would have towed the car for this reason absent getting a search warrant, the officer would have conducted an inventory search of the car before it was towed, and the officer would have discovered the evidence pursuant to this inventory search. Thus, the evidence would have been inevitably discovered. *See id.*

Police may lawfully impound a vehicle that lacks insurance pursuant to their "traditional community care-taking function." *Commonwealth v. Henley*, 909 A.2d 352, 365 (Pa.Super. 2006) (*en banc*). This is because the owner of an uninsured vehicle may not be able to cover the cost of damages

---

[1] In *Bailey*, this Court held that, although permission to search a car was coerced and invalid, and the search itself was not an inventory search, the police would have been able to tow the defendant's car pursuant to his arrest, and the police would have been able to conduct a routine inventory search of the car before it was towed. Thus, in *Bailey*, we held the evidence discovered by the police was admissible under the inevitable discovery doctrine.

resulting from an accident, and thus jeopardizes public safety. ***Id.*** Once police have lawfully impounded a vehicle, they may conduct an inventory search if doing so is "in accordance with a reasonable, standard policy of routinely securing and inventorying the contents of the impounded vehicle." ***Commonwealth v. Lagenella***, 623 Pa. 434, 83 A.3d 94, 102 (2013).

Here, Officer Brodzinski testified that the policy of his department provides for impounding uninsured vehicles and for routinely searching impounded vehicles to secure and inventory their contents. This comports with the law. ***See Commonwealth v. Legette***, 2024 WL 3441397 (Pa.Super. filed 7/17/24) (unpublished memorandum).[2] In fact, Officer Brodzinski specifically testified the only reason he did not have the Honda towed for lack of insurance and conduct an inventory search pursuant thereto was "because [he] knew [he] was applying for a search warrant." N.T., 1/19/22, at 77. Particularly given that the driver (Appellee Flamer) stopped the Honda in "the middle of the street," and then revealed he had no insurance, I have no

_____

[2] Pursuant to Pa.R.A.P. 126(b), unpublished non-precedential decisions of this Court filed after May 1, 2019, may be cited for their persuasive value. I find ***Legette*** to be persuasive. Therein, the officer testified the policy of his department provided for impounding vehicles lacking insurance, as well as routinely conducting inventory searches prior to the towing of the vehicles. The defendant argued the police were required to immobilize an uninsured vehicle, as well as leave it unattended and parked across three parking spaces. The officer concluded impounding the vehicle was the safest option. Thus, a panel of this Court held the officer was permitted to conduct an inventory search prior to the vehicle being towed. ***Legette***, ***supra***.

- 10 -

difficulty concluding Officer Brodzinski would have been able to tow the Honda and search it pursuant to his department's policies concerning inventory searches. Thus, the evidence would have been discovered absent any unjustified prolonged traffic stop and was admissible under the inevitable discovery doctrine.

Therefore, contrary to the Majority, I would reverse the suppression court's orders and remand this matter for further proceedings. Accordingly, I respectfully dissent.

J-A12027-24
J-A12028-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
Appellant :
:
:
:
v. :
:
:
:
SHAQUIL BRINSON : No. 898 EDA 2023

Appeal from the Order Entered March 3, 2023
In the Court of Common Pleas of Delaware County Criminal Division at
No(s): CP-23-CR0003532-2021


COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
Appellant :
:
:
:
v. :
:
:
:
NAASIR FLAMER : No. 473 EDA 2023

Appeal from the Order Entered January 9, 2023
In the Court of Common Pleas of Delaware County Criminal Division at
No(s): CP-23-CR0003533-2021


BEFORE: PANELLA, P.J.E., KING, J., and STEVENS, P.J.E.[*]

DISSENTING MEMORANDUM BY STEVENS, P.J.E.: **FILED OCTOBER 25, 2024**

Appellees' suppression motions should have been denied. While the

Majority offers a thoughtful analysis, I conclude that, assuming, *arguendo*, the

officer prolonged the traffic stop without justification, and the search warrant

_____

[*] Former Justice specially assigned to the Superior Court.

was invalid, the officer would have been permitted to tow the uninsured vehicle and conduct an inventory search pursuant thereto such that the evidence would have been inevitably discovered.

Therefore, as I would reverse the suppression court's orders granting Appellees' motions to suppress the physical evidence seized from the vehicle, I respectfully dissent.

It's undisputed that Colwyn Borough Police Officer Michael Brodzinski was the sole testifying witness at the suppression hearing. The suppression court specifically indicated it found Officer Brodzinski to be credible. Suppression Court Opinion, filed 2/27/23, at 4; Suppression Court Opinion, filed 3/3/23, at 4.

Officer Brodzinski testified that, while on patrol on May 31, 2021, at approximately 7:30 p.m., he observed a white, two-door Honda fail to stop for a stop sign. N.T., 1/19/22, at 29. Accordingly, Officer Brodzinski effectuated a traffic stop of the Honda. *Id.* The officer specifically testified the Honda stopped "in the middle of the street," and the officer stopped his marked police vehicle behind the Honda. *Id.* at 60. The officer testified he wasn't sure if the Honda could have pulled over to a safe spot since there were cars parked on the side of the street. *Id.*

Officer Brodzinski exited his police vehicle and approached the passenger side of the Honda, which had the window rolled down. *Id.* at 30. Two men were inside of the Honda; namely, Appellee Nassir Flamer was in

the driver's seat while Appellee Shaquil Brinson was in the passenger's seat. *Id.* at 30-31. Officer Brodzinski testified he had prior contact with Appellee Brinson approximately one month earlier, which resulted in drug charges against Appellee Brinson. *Id.* at 44. Officer Brodzinski asked Appellee Flamer for his driver's license, registration, and insurance. *Id.* at 32. Appellee Flamer provided his driver's license and registration; however, he "was unable to provide an insurance card." *Id.*

Officer Brodzinski testified that, when drivers have no insurance, the police "commonly tow their vehicle," but police have some "discretion." *Id.* He specified that "there's certain things that we tow for, [but] there's no certain procedure of how it gets towed." *Id.* at 59. Officer Brodzinski clarified that the Colwyn Borough Police Department has a procedure to follow when police are going to tow a vehicle. *Id.* at 75. Specifically, before a vehicle is towed, the police call for the tow truck and then conduct "an inventory search" on the vehicle. *Id.* The officer explained an "inventory search is a search for valuables, so when [the vehicle] goes to a tow yard,…the vehicle owner can't say that anything was stolen out of the vehicle." *Id.* at 75-76. He testified an inventory search is something that he normally does on every vehicle that is going to be towed, and it is "department policy." *Id.* at 76. During the inventory search, the police look everywhere a person could put something valuable. *Id.*

Officer Brodzinski testified Appellee Flamer seemed "excitedly nervous," and based on his training and experience, Appellee Flamer's demeanor seemed "odd." *Id.* at 33. Meanwhile, Appellee Brinson "kept his head down the entire time and stared at the floorboard." *Id.* at 34.

Officer Brodzinski asked Appellee Flamer to exit the Honda and "come back to [the police] vehicle so [the officer] could talk to him at the passenger side window [of the police vehicle]." *Id.* Appellee Flamer complied, and, while the officer sat in the driver's seat of the police vehicle checking Appellee Flamer's driver's license, Appellee Flamer stood by the passenger side window. *Id.* Officer Brodzinski testified Appellee Flamer "was very nervous at the window. He was pacing back and forth." *Id.*

The officer asked Appellee Flamer where he was headed, and he responded he was going to a barbecue in southwest Philadelphia. *Id.* Officer Brodzinski asked Appellee Flamer why he was so nervous, and he responded, "I'm not nervous, bro. I have nothing illegal in my car. I have nothing to be nervous for." *Id.* at 35. Officer Brodzinski indicated that, up to this point, he had not mentioned to either of the Honda's occupants that he believed the vehicle contained any illegal contraband. *Id.* The officer then asked Appellee Flamer for consent to search the Honda, and he replied, "No, bro. I don't have any weed in the car, you know, there's no reason for you to search it." *Id.* Officer Brodzinski indicated that, up to this point, he had not mentioned to either occupant anything about "weed or marijuana." *Id.*

After this conversation with Appellee Flamer, the officer asked Appellee Brinson, who had yet to make eye contact with the officer, to step out of the Honda. *Id.* at 36. The officer noted Appellee Brinson was very nervous with his hands shaking. *Id.* at 45. As Appellee Brinson exited the Honda, he "became aggravated at [the officer] and said that [he] was doing it for a racial thing." *Id.* Nevertheless, Appellee Brinson sat on the curb while Appellee Flamer sat on a nearby ledge. *Id.* at 36. Neither man was placed in handcuffs. *Id.*

Officer Brodzinski informed Appellee Flamer that he was going to request the K-9 Unit to sniff for illegal narcotics, and in response, Appellee Flamer said, "go ahead, you can get the dog." *Id.* at 37. Appellee Flamer then spontaneously stated that he "just got out of jail for a parole violation,…[and] he doesn't want to go back." *Id.* at 38. He began showing the officer pictures of his family, and he announced that "this is why he stays out of jail[.]" *Id*.

The officer explained:

[Appellee] Flamer was nervous, he was excited, he was pacing back and forth, showing pictures of the family and kids. It's almost an empathy thing that I've commonly ran into over my career is that they use that to kind of an advantage of trying to get somebody to feel bad and not go forward on what's happening.

*Id.*

Officer Brodzinski clarified that he called dispatch for the K-9 Unit approximately 10 to 15 minutes after he stopped the Honda, and the K-9 Unit

arrived on the scene approximately 20 to 25 minutes after he called dispatch. *Id.* at 40-41. During the sniff of the vehicle, the dog "indicated on the vehicle driver side and passenger side." *Id.* at 40.

The officer testified that, at this point, he called for a tow truck. *Id.* at 41. Specifically, the relevant exchange occurred between the assistant district attorney and the officer:

> Q: You said that the car was towed?
> A: Yes.
> Q: Why was the car towed?
> A: To request a search warrant.
> Q: Why were you going to request a search warrant?
> A: For the dog's indication on the vehicle.
> Q: Was there any other reason to tow the car?
> A: Yes, we could have towed it for insurance reasons.
> Q: Did you ever get valid insurance on that car?
> A: No.

*Id.*

Officer Brodzinski clarified that the only reason he did not request a tow truck for lack of insurance, and conduct an inventory search pursuant thereto, was "because [he] knew [he] was applying for a search warrant." *Id.* at 77. After the Honda was towed to the police station, the officer received and executed a search warrant. *Id.* at 53. He found a handgun and pills in the vehicle. *Id.*

Based on the aforementioned, the suppression court granted Appellee Brinson's and Appellee Flamer's motions to suppress the evidence seized from

the Honda. Initially, the suppression court held Officer Brodzinski lawfully stopped the Honda, properly requested that Appellee Flamer provide his driving documents, and properly ordered the occupants out of the Honda. ***See*** Suppression Court Opinion, filed 2/27/23, at 4-5; Suppression Court Opinion, filed 3/3/23, at 4-5. However, the suppression court concluded the officer did not have sufficient justification to prolong the traffic stop beyond its "mission to address the traffic violation that warranted the stop and attend to related safety concerns." ***Id.*** at 5.

Moreover, in its Rule 1925(a) opinion, the suppression court further explained:

> [T]he traffic stop should have concluded before Officer Brodzinski called for the K-9 Unit. The initial purpose of the stop, which was to issue a ticket for failure to stop at a stop sign, reasonably should have been completed by the time Officer Brodzinski requested the K-9 Unit, which occurred 10-15 minutes later. Consequently, Officer Brodzinski was not justified in prolonging the stop behind the necessary duration unless he had probable cause. There was neither probable cause nor reasonable suspicion to extend the traffic stop for up to 30 minutes for a K-9 search. [Appellees'] nervous behavior alone did not provide sufficient basis to warrant the search by the K-9 Unit.

Suppression Court Opinion, filed 6/22/23, at 5-6.

Notably, the suppression court did not fully analyze whether, irrespective of the prolonged detention that ultimately resulted in Officer Brodzinski applying for and executing a search warrant, the Honda would have been towed for lack of insurance, and, thus subject to an inventory search wherein the discovery of the evidence was inevitable.

On appeal, *inter alia*, the Majority relevantly concludes that "Officer Brodzinski presented evidence solely that the evidence **could** have been lawfully discovered, not that it **would** have been lawfully discovered pursuant to a constitutionally sound inventory search." Majority Memorandum at 22 (bold in original). Thus, in affirming the suppression court, in addition to holding the officer lacked reasonable suspicion to extend the traffic stop and request the K-9 Unit, the Majority rejects the Commonwealth's claim of inevitable discovery pursuant to a proper inventory search. After a careful review, I respectfully disagree with the Majority.

There is no dispute Officer Brodzinski lawfully stopped the Honda. Also, Officer Brodzinski properly determined that Appellee Flamer was operating the Honda without valid insurance. ***Commonwealth v. Malloy***, 257 A.3d 142, 149-50 (Pa.Super. 2021) (holding police officers are allowed to make "incidental inquiries aimed at ensuring the safe and responsible operation of vehicles on the highway" such as inspecting the vehicle's proof of insurance during a routine traffic stop). Thus, Officer Brodzinski was legally permitted to tow the Honda and, pursuant to department policy, would have conducted an inventory search prior thereto. Therefore, because there is no dispute the evidence would have been found during a valid inventory search, I conclude the suppression court erred in suppressing the evidence.

Regarding inevitable discovery, this Court has held as follows:

> [E]vidence which would have been discovered [is] sufficiently purged of the original illegality to allow admission of

- 8 -

the evidence…[I]mplicit in this doctrine is the fact that the evidence would have been discovered despite the initial illegality.

If the prosecution can establish by a preponderance of the evidence that the illegally obtained evidence ultimately or inevitably would have been discovered by lawful means, the evidence is admissible. The purpose of the inevitable discovery rule is to block setting aside convictions that would have been obtained without police misconduct.

*Commonwealth v. Bailey*, 986 A.2d 860, 862 (Pa.Super. 2009) (quotation omitted).[1]

In this matter, the Commonwealth argues the police were legally permitted to tow the Honda because the driver (Appellee Flamer) did not have proof of valid insurance, the officer would have towed the car for this reason absent getting a search warrant, the officer would have conducted an inventory search of the car before it was towed, and the officer would have discovered the evidence pursuant to this inventory search. Thus, the evidence would have been inevitably discovered. *See id.*

Police may lawfully impound a vehicle that lacks insurance pursuant to their "traditional community care-taking function." *Commonwealth v. Henley*, 909 A.2d 352, 365 (Pa.Super. 2006) (*en banc*). This is because the owner of an uninsured vehicle may not be able to cover the cost of damages

_____

[1] In *Bailey*, this Court held that, although permission to search a car was coerced and invalid, and the search itself was not an inventory search, the police would have been able to tow the defendant's car pursuant to his arrest, and the police would have been able to conduct a routine inventory search of the car before it was towed. Thus, in *Bailey*, we held the evidence discovered by the police was admissible under the inevitable discovery doctrine.

resulting from an accident, and thus jeopardizes public safety. ***Id.*** Once police have lawfully impounded a vehicle, they may conduct an inventory search if doing so is "in accordance with a reasonable, standard policy of routinely securing and inventorying the contents of the impounded vehicle." ***Commonwealth v. Lagenella***, 623 Pa. 434, 83 A.3d 94, 102 (2013).

Here, Officer Brodzinski testified that the policy of his department provides for impounding uninsured vehicles and for routinely searching impounded vehicles to secure and inventory their contents. This comports with the law. ***See Commonwealth v. Legette***, 2024 WL 3441397 (Pa.Super. filed 7/17/24) (unpublished memorandum).[2] In fact, Officer Brodzinski specifically testified the only reason he did not have the Honda towed for lack of insurance and conduct an inventory search pursuant thereto was "because [he] knew [he] was applying for a search warrant." N.T., 1/19/22, at 77. Particularly given that the driver (Appellee Flamer) stopped the Honda in "the middle of the street," and then revealed he had no insurance, I have no

---

[2] Pursuant to Pa.R.A.P. 126(b), unpublished non-precedential decisions of this Court filed after May 1, 2019, may be cited for their persuasive value. I find ***Legette*** to be persuasive. Therein, the officer testified the policy of his department provided for impounding vehicles lacking insurance, as well as routinely conducting inventory searches prior to the towing of the vehicles. The defendant argued the police were required to immobilize an uninsured vehicle, as well as leave it unattended and parked across three parking spaces. The officer concluded impounding the vehicle was the safest option. Thus, a panel of this Court held the officer was permitted to conduct an inventory search prior to the vehicle being towed. ***Legette***, ***supra***.

difficulty concluding Officer Brodzinski would have been able to tow the Honda and search it pursuant to his department's policies concerning inventory searches. Thus, the evidence would have been discovered absent any unjustified prolonged traffic stop and was admissible under the inevitable discovery doctrine.

Therefore, contrary to the Majority, I would reverse the suppression court's orders and remand this matter for further proceedings. Accordingly, I respectfully dissent.

J-A12027-24
J-A12028-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| SHAQUIL BRINSON | : | No. 898 EDA 2023 |

Appeal from the Order Entered March 3, 2023
In the Court of Common Pleas of Delaware County Criminal Division at
No(s):  CP-23-CR0003532-2021

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| NAASIR FLAMER | : | No. 473 EDA 2023 |

Appeal from the Order Entered January 9, 2023
In the Court of Common Pleas of Delaware County Criminal Division at
No(s):  CP-23-CR0003533-2021

BEFORE:   PANELLA, P.J.E., KING, J., and STEVENS, P.J.E.[*]

DISSENTING MEMORANDUM BY STEVENS, P.J.E.:**FILED OCTOBER 25, 2024**

Appellees' suppression motions should have been denied. While the

Majority offers a thoughtful analysis, I conclude that, assuming, *arguendo*, the

officer prolonged the traffic stop without justification, and the search warrant

_____

[*] Former Justice specially assigned to the Superior Court.

was invalid, the officer would have been permitted to tow the uninsured vehicle and conduct an inventory search pursuant thereto such that the evidence would have been inevitably discovered.

Therefore, as I would reverse the suppression court's orders granting Appellees' motions to suppress the physical evidence seized from the vehicle, I respectfully dissent.

It's undisputed that Colwyn Borough Police Officer Michael Brodzinski was the sole testifying witness at the suppression hearing. The suppression court specifically indicated it found Officer Brodzinski to be credible. Suppression Court Opinion, filed 2/27/23, at 4; Suppression Court Opinion, filed 3/3/23, at 4.

Officer Brodzinski testified that, while on patrol on May 31, 2021, at approximately 7:30 p.m., he observed a white, two-door Honda fail to stop for a stop sign. N.T., 1/19/22, at 29. Accordingly, Officer Brodzinski effectuated a traffic stop of the Honda. *Id.* The officer specifically testified the Honda stopped "in the middle of the street," and the officer stopped his marked police vehicle behind the Honda. *Id.* at 60. The officer testified he wasn't sure if the Honda could have pulled over to a safe spot since there were cars parked on the side of the street. *Id.*

Officer Brodzinski exited his police vehicle and approached the passenger side of the Honda, which had the window rolled down. *Id.* at 30. Two men were inside of the Honda; namely, Appellee Nassir Flamer was in

the driver's seat while Appellee Shaquil Brinson was in the passenger's seat. *Id.* at 30-31. Officer Brodzinski testified he had prior contact with Appellee Brinson approximately one month earlier, which resulted in drug charges against Appellee Brinson. *Id.* at 44. Officer Brodzinski asked Appellee Flamer for his driver's license, registration, and insurance. *Id.* at 32. Appellee Flamer provided his driver's license and registration; however, he "was unable to provide an insurance card." *Id.*

Officer Brodzinski testified that, when drivers have no insurance, the police "commonly tow their vehicle," but police have some "discretion." *Id.* He specified that "there's certain things that we tow for, [but] there's no certain procedure of how it gets towed." *Id.* at 59. Officer Brodzinski clarified that the Colwyn Borough Police Department has a procedure to follow when police are going to tow a vehicle. *Id.* at 75. Specifically, before a vehicle is towed, the police call for the tow truck and then conduct "an inventory search" on the vehicle. *Id.* The officer explained an "inventory search is a search for valuables, so when [the vehicle] goes to a tow yard,…the vehicle owner can't say that anything was stolen out of the vehicle." *Id.* at 75-76. He testified an inventory search is something that he normally does on every vehicle that is going to be towed, and it is "department policy." *Id.* at 76. During the inventory search, the police look everywhere a person could put something valuable. *Id.*

- 3 -

Officer Brodzinski testified Appellee Flamer seemed "excitedly nervous," and based on his training and experience, Appellee Flamer's demeanor seemed "odd." *Id.* at 33. Meanwhile, Appellee Brinson "kept his head down the entire time and stared at the floorboard." *Id.* at 34.

Officer Brodzinski asked Appellee Flamer to exit the Honda and "come back to [the police] vehicle so [the officer] could talk to him at the passenger side window [of the police vehicle]." *Id.* Appellee Flamer complied, and, while the officer sat in the driver's seat of the police vehicle checking Appellee Flamer's driver's license, Appellee Flamer stood by the passenger side window. *Id.* Officer Brodzinski testified Appellee Flamer "was very nervous at the window. He was pacing back and forth." *Id.*

The officer asked Appellee Flamer where he was headed, and he responded he was going to a barbecue in southwest Philadelphia. *Id.* Officer Brodzinski asked Appellee Flamer why he was so nervous, and he responded, "I'm not nervous, bro. I have nothing illegal in my car. I have nothing to be nervous for." *Id.* at 35. Officer Brodzinski indicated that, up to this point, he had not mentioned to either of the Honda's occupants that he believed the vehicle contained any illegal contraband. *Id.* The officer then asked Appellee Flamer for consent to search the Honda, and he replied, "No, bro. I don't have any weed in the car, you know, there's no reason for you to search it." *Id.* Officer Brodzinski indicated that, up to this point, he had not mentioned to either occupant anything about "weed or marijuana." *Id.*

After this conversation with Appellee Flamer, the officer asked Appellee Brinson, who had yet to make eye contact with the officer, to step out of the Honda. *Id.* at 36. The officer noted Appellee Brinson was very nervous with his hands shaking. *Id.* at 45. As Appellee Brinson exited the Honda, he "became aggravated at [the officer] and said that [he] was doing it for a racial thing." *Id.* Nevertheless, Appellee Brinson sat on the curb while Appellee Flamer sat on a nearby ledge. *Id.* at 36. Neither man was placed in handcuffs. *Id.*

Officer Brodzinski informed Appellee Flamer that he was going to request the K-9 Unit to sniff for illegal narcotics, and in response, Appellee Flamer said, "go ahead, you can get the dog." *Id.* at 37. Appellee Flamer then spontaneously stated that he "just got out of jail for a parole violation,…[and] he doesn't want to go back." *Id.* at 38. He began showing the officer pictures of his family, and he announced that "this is why he stays out of jail[.]" *Id*.

The officer explained:

[Appellee] Flamer was nervous, he was excited, he was pacing back and forth, showing pictures of the family and kids. It's almost an empathy thing that I've commonly ran into over my career is that they use that to kind of an advantage of trying to get somebody to feel bad and not go forward on what's happening.

*Id.*

Officer Brodzinski clarified that he called dispatch for the K-9 Unit approximately 10 to 15 minutes after he stopped the Honda, and the K-9 Unit

arrived on the scene approximately 20 to 25 minutes after he called dispatch. *Id.* at 40-41. During the sniff of the vehicle, the dog "indicated on the vehicle driver side and passenger side." *Id.* at 40.

The officer testified that, at this point, he called for a tow truck. *Id.* at 41. Specifically, the relevant exchange occurred between the assistant district attorney and the officer:

> Q: You said that the car was towed?
> A: Yes.
> Q: Why was the car towed?
> A: To request a search warrant.
> Q: Why were you going to request a search warrant?
> A: For the dog's indication on the vehicle.
> Q: Was there any other reason to tow the car?
> A: Yes, we could have towed it for insurance reasons.
> Q: Did you ever get valid insurance on that car?
> A: No.

*Id.*

Officer Brodzinski clarified that the only reason he did not request a tow truck for lack of insurance, and conduct an inventory search pursuant thereto, was "because [he] knew [he] was applying for a search warrant." *Id.* at 77. After the Honda was towed to the police station, the officer received and executed a search warrant. *Id.* at 53. He found a handgun and pills in the vehicle. *Id.*

Based on the aforementioned, the suppression court granted Appellee Brinson's and Appellee Flamer's motions to suppress the evidence seized from

the Honda. Initially, the suppression court held Officer Brodzinski lawfully stopped the Honda, properly requested that Appellee Flamer provide his driving documents, and properly ordered the occupants out of the Honda. *See* Suppression Court Opinion, filed 2/27/23, at 4-5; Suppression Court Opinion, filed 3/3/23, at 4-5. However, the suppression court concluded the officer did not have sufficient justification to prolong the traffic stop beyond its "mission to address the traffic violation that warranted the stop and attend to related safety concerns." *Id.* at 5.

Moreover, in its Rule 1925(a) opinion, the suppression court further explained:

> [T]he traffic stop should have concluded before Officer Brodzinski called for the K-9 Unit. The initial purpose of the stop, which was to issue a ticket for failure to stop at a stop sign, reasonably should have been completed by the time Officer Brodzinski requested the K-9 Unit, which occurred 10-15 minutes later. Consequently, Officer Brodzinski was not justified in prolonging the stop behind the necessary duration unless he had probable cause. There was neither probable cause nor reasonable suspicion to extend the traffic stop for up to 30 minutes for a K-9 search. [Appellees'] nervous behavior alone did not provide sufficient basis to warrant the search by the K-9 Unit.

Suppression Court Opinion, filed 6/22/23, at 5-6.

Notably, the suppression court did not fully analyze whether, irrespective of the prolonged detention that ultimately resulted in Officer Brodzinski applying for and executing a search warrant, the Honda would have been towed for lack of insurance, and, thus subject to an inventory search wherein the discovery of the evidence was inevitable.

On appeal, *inter alia*, the Majority relevantly concludes that "Officer Brodzinski presented evidence solely that the evidence **could** have been lawfully discovered, not that it **would** have been lawfully discovered pursuant to a constitutionally sound inventory search." Majority Memorandum at 22 (bold in original). Thus, in affirming the suppression court, in addition to holding the officer lacked reasonable suspicion to extend the traffic stop and request the K-9 Unit, the Majority rejects the Commonwealth's claim of inevitable discovery pursuant to a proper inventory search. After a careful review, I respectfully disagree with the Majority.

There is no dispute Officer Brodzinski lawfully stopped the Honda. Also, Officer Brodzinski properly determined that Appellee Flamer was operating the Honda without valid insurance. *Commonwealth v. Malloy*, 257 A.3d 142, 149-50 (Pa.Super. 2021) (holding police officers are allowed to make "incidental inquiries aimed at ensuring the safe and responsible operation of vehicles on the highway" such as inspecting the vehicle's proof of insurance during a routine traffic stop). Thus, Officer Brodzinski was legally permitted to tow the Honda and, pursuant to department policy, would have conducted an inventory search prior thereto. Therefore, because there is no dispute the evidence would have been found during a valid inventory search, I conclude the suppression court erred in suppressing the evidence.

Regarding inevitable discovery, this Court has held as follows:

> [E]vidence which would have been discovered [is] sufficiently purged of the original illegality to allow admission of

the evidence…[I]mplicit in this doctrine is the fact that the evidence would have been discovered despite the initial illegality.

If the prosecution can establish by a preponderance of the evidence that the illegally obtained evidence ultimately or inevitably would have been discovered by lawful means, the evidence is admissible. The purpose of the inevitable discovery rule is to block setting aside convictions that would have been obtained without police misconduct.

*Commonwealth v. Bailey*, 986 A.2d 860, 862 (Pa.Super. 2009) (quotation omitted).[1]

In this matter, the Commonwealth argues the police were legally permitted to tow the Honda because the driver (Appellee Flamer) did not have proof of valid insurance, the officer would have towed the car for this reason absent getting a search warrant, the officer would have conducted an inventory search of the car before it was towed, and the officer would have discovered the evidence pursuant to this inventory search. Thus, the evidence would have been inevitably discovered. *See id.*

Police may lawfully impound a vehicle that lacks insurance pursuant to their "traditional community care-taking function." *Commonwealth v. Henley*, 909 A.2d 352, 365 (Pa.Super. 2006) (*en banc*). This is because the owner of an uninsured vehicle may not be able to cover the cost of damages

_____

[1] In *Bailey*, this Court held that, although permission to search a car was coerced and invalid, and the search itself was not an inventory search, the police would have been able to tow the defendant's car pursuant to his arrest, and the police would have been able to conduct a routine inventory search of the car before it was towed. Thus, in *Bailey*, we held the evidence discovered by the police was admissible under the inevitable discovery doctrine.

resulting from an accident, and thus jeopardizes public safety. *Id.* Once police have lawfully impounded a vehicle, they may conduct an inventory search if doing so is "in accordance with a reasonable, standard policy of routinely securing and inventorying the contents of the impounded vehicle." *Commonwealth v. Lagenella*, 623 Pa. 434, 83 A.3d 94, 102 (2013).

Here, Officer Brodzinski testified that the policy of his department provides for impounding uninsured vehicles and for routinely searching impounded vehicles to secure and inventory their contents. This comports with the law. *See Commonwealth v. Legette*, 2024 WL 3441397 (Pa.Super. filed 7/17/24) (unpublished memorandum).[2] In fact, Officer Brodzinski specifically testified the only reason he did not have the Honda towed for lack of insurance and conduct an inventory search pursuant thereto was "because [he] knew [he] was applying for a search warrant." N.T., 1/19/22, at 77. Particularly given that the driver (Appellee Flamer) stopped the Honda in "the middle of the street," and then revealed he had no insurance, I have no

---

[2] Pursuant to Pa.R.A.P. 126(b), unpublished non-precedential decisions of this Court filed after May 1, 2019, may be cited for their persuasive value. I find *Legette* to be persuasive. Therein, the officer testified the policy of his department provided for impounding vehicles lacking insurance, as well as routinely conducting inventory searches prior to the towing of the vehicles. The defendant argued the police were required to immobilize an uninsured vehicle, as well as leave it unattended and parked across three parking spaces. The officer concluded impounding the vehicle was the safest option. Thus, a panel of this Court held the officer was permitted to conduct an inventory search prior to the vehicle being towed. *Legette*, *supra*.

difficulty concluding Officer Brodzinski would have been able to tow the Honda and search it pursuant to his department's policies concerning inventory searches. Thus, the evidence would have been discovered absent any unjustified prolonged traffic stop and was admissible under the inevitable discovery doctrine.

Therefore, contrary to the Majority, I would reverse the suppression court's orders and remand this matter for further proceedings. Accordingly, I respectfully dissent.