J-A12027-24
J-A12028-24

2024 PA Super 293

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
                                     :            PENNSYLVANIA
           Appellant          :
                                       :
           v.                         :
                                       :
SHAQUIL BRINSON              :
                                       :
                                       :        No. 898 EDA 2023

Appeal from the Order Entered March 3, 2023
In the Court of Common Pleas of Delaware County
Criminal Division at No(s): CP-23-CR0003532-2021

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
                                     :            PENNSYLVANIA
           Appellant          :
                                       :
           v.                         :
                                       :
NAASIR FLAMER               :
                                       :
                                       :        No. 473 EDA 2023

Appeal from the Order Entered January 9, 2023
In the Court of Common Pleas of Delaware County
Criminal Division at No(s): CP-23-CR-0003533-2021

BEFORE: PANELLA, P.J.E., KING, J., and STEVENS, P.J.E.[*]

OPINION BY KING, J.:                            **FILED DECEMBER 9, 2024**

       Appellant, the Commonwealth of Pennsylvania, appeals from the orders entered in the Delaware County Court of Common Pleas, which granted the motions to suppress evidence filed by Appellees, Shaquil Brinson and Naasir

_____

[*] Former Justice specially assigned to the Superior Court.

J-A12027-24
J-A12028-24

Flamer.[1]  We affirm.

The suppression court set forth the relevant facts and procedural history

of these appeals as follows:

> On May 31, 2021, at approximately 7:27 p.m., Officer
> Michael Brodzinski … was patrolling the area of South Third
> and Chestnut Streets in Colwyn Borough, Delaware County.
> There, he effectuated a traffic stop of a white Honda two
> door car for failing to stop at a stop sign.  Upon approaching
> the subject vehicle, he noticed there were two people inside
> the car; [Brinson was seated in] the front seat passenger of
> the vehicle.  Upon approaching the vehicle, Officer
> Brodzinski asked [Flamer,] the driver of the vehicle[,] for
> his license, registration, and insurance card.  [Flamer] was
> able to provide his license and registration but claimed he
> did not have his insurance card on him at the time.  At the
> preliminary hearing, Officer Brodzinski alleged that [Brinson
> and Flamer] were nervous upon getting pulled over.
> However, at the suppression hearing, [Officer Brodzinski]
> testified that [Brinson and Flamer] appeared to be
> "excitedly" nervous contradicting his testimony at the
> preliminary hearing.  Officer Brodzinski additionally testified
> that [Brinson] kept his head down and stared at the floor of
> the vehicle while [Flamer] was speaking to him about his
> documentation.
>
> Officer Brodzinski asked [Flamer] to exit his vehicle and
> come back to his patrol car while he ran his license; [Flamer]
> complied.  Officer Brodzinski never testified that he
> attempted to verify whether the driver's vehicle was actually
> insured.  Standing outside of the marked police vehicle,
> [Flamer] informed Officer Brodzinski that he and [Brinson]
> were on the way to a barbeque in Southwest Philadelphia at
> the time of the stop.  Officer Brodzinski asked [Flamer] why
> he was nervous, and he responded that he had no reason to
> be nervous as there was "nothing illegal" in his car.  At this

---

[1] The underlying facts, suppression court's opinions, issues raised by the
Commonwealth, and briefs by the Commonwealth are nearly identical in both
appeals.  Accordingly, we address these appeals in a single memorandum for
purposes of judicial economy.

time, Officer Brodzinski asked [Flamer] if he could search his vehicle to which [Flamer] responded that he could not as he was in a rush to get to the barbeque. [Brinson] was still in the vehicle at this time and was not free to leave. Officer Brodzinski asked [Brinson] to step out of the vehicle and informed both [Brinson] and [Flamer] that a K-9 would have to be requested for the scene to sniff for narcotics. Colwyn Borough's police department did not have a K-9 unit so one had to come from another department. The officer ordered the K-9 unit approximately 10 to 15 minutes after the traffic stop, and the K-9 unit took another 20 to 30 minutes to arrive on scene. Officer Brodzinski ordered the K-9 unit due to the nervous behavior of [Brinson and Flamer] as well as [his] prior experience with [Brinson].

While waiting for the K-9, [Flamer] showed Officer Brodzinski pictures of his family and asked him if he could retrieve a hoodie out of the rear seat area vehicle. While retrieving the hoodie, Officer Brodzinski noticed the scent of marijuana, but no contraband was in plain sight. Before the officer called for the K-9 he never noticed the smell of marijuana. When the K-9 unit arrived, it indicated the driver's and passenger's side doors. At this time, [Brinson and Flamer] were detained.

The car was then towed to obtain a search warrant for the K-9 indicated areas. Officer Brodzinski testified that it was discretionary whether or not to tow a vehicle for failure to have insurance. Moreover, Colwyn had no certain procedure of how a vehicle gets towed.

(Suppression Court Opinion (Brinson's case), filed 7/12/23, at 1-3) (internal citations omitted). During a subsequent search of the car, officers recovered a firearm with an altered serial number and nine pills, later identified as oxycodone.

The Commonwealth charged Brinson and Flamer with persons not to possess firearms, firearms not to be carried without a license, possession of a firearm with an altered serial number, intentional possession of a controlled

substance by a person not registered, and use or possession of drug paraphernalia.[2] Additionally, the Commonwealth charged Flamer with escape, resisting arrest, aggravated assault of a police officer, flight to avoid apprehension, simple assault, criminal mischief and damage of property, and summary offenses under the Motor Vehicle Code.[3]

On November 5, 2021, Brinson filed a motion to suppress all physical evidence, which Flamer joined. The court held a suppression hearing on January 19, 2022. The court denied the motion on March 15, 2022.

On May 18, 2022, Brinson's counsel sought leave to withdraw from representation, which the trial court granted. Flamer also hired new counsel, and on September 14, 2022, filed a motion for reconsideration from the denial of the suppression motion, asserting that prior counsel had provided ineffective assistance. The court subsequently granted reconsideration. On November 23, 2022, the trial court held oral argument on the suppression motion, at which the parties stipulated to admission of the notes of testimony from the original suppression hearing held on January 19, 2022. On January 9, 2023, the court entered an order granting Flamer's motion and suppressing all evidence recovered from the car.

---

[2] 18 Pa.C.S.A. §§ 6105, 6106, 6110.2, 35 P.S. §§ 780-113(a)(16), (a)(32), respectively.

[3] 18 Pa.C.S.A. §§ 5121(a), 5104, 2702(a)(3), 5126(a), 2701(a)(1), 3304(a)(5), 75 P.S. §§ 3323(b), 1786(f), respectively.

On January 12, 2023, Brinson, now represented by new counsel, also filed a renewed motion to suppress.

On February 8, 2023, the Commonwealth filed a timely notice of appeal from the order granting Flamer's suppression motion, pursuant to Pa.R.A.P. 311(d). On February 10, 2023, the court ordered the Commonwealth to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b), and the Commonwealth complied on March 3, 2023.

On March 2, 2023, the court held oral argument on Brinson's suppression motion, at which the parties stipulated to admission of the notes of testimony from the original suppression hearing held on January 19, 2022. At the conclusion of the hearing, the court orally granted the motion (consistent with the court's ruling in Flamer's case) and entered an order to that effect on Brinson's docket the following day.

On March 31, 2023, the Commonwealth filed a timely notice of appeal at Brinson's docket under Rule 311(d). On April 6, 2023, the court ordered the Commonwealth to file a Rule 1925(b) statement on Brison's docket, and the Commonwealth complied on April 27, 2023.

The Commonwealth raises the following issues for our review:

> 1. Whether the suppression court erred in applying a probable cause standard to a prolonged traffic stop and canine sniff, both which only require reasonable suspicion, which, based upon the totality of facts and circumstances present, existed to justify further investigation, including performing an exterior canine sniff?
>
> 2. Irrespective of the prolonged detention that ultimately

- 5 -

resulted in Officer Brodzinski applying for and executing a search warrant, whether the vehicle would have been towed for lack of insurance, and thus subjected to an inventory search wherein the discovery of the evidence was inevitable?

(Commonwealth's Brief at 3).

In its first issue, the Commonwealth argues that the suppression court erred in finding that the traffic stop and canine sniff constituted a custodial detention rather than an investigative detention. According to the Commonwealth, the court should have applied a reasonable suspicion standard which, based upon the totality of the facts and circumstances present, justified further investigation. Further, the Commonwealth asserts that the court erred in relying upon ***Commonwealth v. Barr***, ___ Pa. ___, 266 A.3d 25 (2021),[4] because the odor of marijuana was not a factor used to support the prolonged detention or to request the K-9 sniff. Additionally, the Commonwealth implies that Flamer consented to the search when he said, "go ahead and call the dog."[5] The Commonwealth concludes that the court should have denied the suppression motion, and this Court must grant relief. We disagree.

_____

[4] In ***Barr***, our Supreme Court held that police lacked probable cause to search a vehicle during the course of a traffic stop based solely on detection of the smell of marijuana emanating from the vehicle. ***See id.***

[5] Officer Brodzinski variously stated that Flamer said "no, you can bring the dog," "you could call for the dog," and "go ahead, you can get the dog." (N.T. Suppression Hearing, 1/19/22, at 37, 67-68).

- 6 -

Our standard of review in addressing a challenge to the suppression court's order granting a suppression motion is well settled:

> When the Commonwealth appeals from a suppression order, we follow a clearly defined standard of review and consider only the evidence from the defendant's witnesses together with the evidence of the prosecution that, when read in the context of the entire record, remains uncontradicted. The suppression court's findings of fact bind an appellate court if the record supports those findings. The suppression court's conclusions of law, however, are not binding on an appellate court, whose duty is to determine if the suppression court properly applied the law to the facts.
>
> Our standard of review is restricted to establishing whether the record supports the suppression court's factual findings; however, we maintain *de novo* review over the suppression court's legal conclusions.

***Commonwealth v. Korn***, 139 A.3d 249, 252-53 (Pa.Super. 2016), *appeal denied*, 639 Pa. 157, 159 A.3d 933 (2016).

The Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution guarantee the right of the people to be secure in their persons, houses, papers, and possessions from unreasonable searches and seizures. ***Commonwealth v. Morrison***, 166 A.3d 357, 363-64 (Pa.Super. 2017). "To secure the right of citizens to be free from unreasonable search and seizure, courts in Pennsylvania require law enforcement officers to demonstrate ascending levels of suspicion to justify their interactions with citizens to the extent those interactions compromise individual liberty." ***Commonwealth v. Hampton***, 204 A.3d 452, 456 (Pa.Super. 2019).

Contacts between the police and citizenry fall within three general classifications:

> The first [level of interaction] is a "mere encounter" (or request for information) which need not be supported by any level of suspicion, but carries no official compulsion to stop or to respond. The second, an "investigative detention" must be supported by a reasonable suspicion; it subjects a suspect to a stop and a period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of an arrest. Finally, an arrest or "custodial detention" must be supported by probable cause.

*Commonwealth v. Goldsborough*, 31 A.3d 299, 305 (Pa.Super. 2011), *appeal denied*, 616 Pa. 651, 49 A.3d 442 (2012) (quoting *Commonwealth v. Bryant*, 866 A.2d 1143, 1146 (Pa.Super. 2005), *appeal denied*, 583 Pa. 668, 876 A.2d 392 (2005)). During a mere encounter, "[a]s long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification." *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980).

Further:

> An investigative detention, unlike a mere encounter, constitutes a seizure of a person and thus activates the protections of Article 1, Section 8 of the Pennsylvania Constitution. To institute an investigative detention, an officer must have at least a reasonable suspicion that criminal activity is afoot. Reasonable suspicion requires a finding that based on the available facts, a person of reasonable caution would believe the intrusion was appropriate.

*    *    *

> Reasonable suspicion exists only where the officer is able to articulate specific observations which, in conjunction with reasonable inferences derived from those observations, led him reasonably to conclude, in light of his experience, that criminal activity was afoot and that the person he stopped was involved in that activity. Therefore, the fundamental inquiry of a reviewing court must be an objective one, namely, whether the facts available to the officer at the moment of intrusion warrant a [person] of reasonable caution in the belief that the action taken was appropriate.

*Commonwealth v. Jones*, 874 A.2d 108, 116 (Pa.Super. 2005) (internal citations omitted).

In other words, "the question of whether reasonable suspicion existed at the time of an investigatory detention must be answered by examining the totality of the circumstances to determine whether there was a particularized and objective basis for suspecting the individual stopped of criminal activity."

*Commonwealth v. Cottman*, 764 A.2d 595, 598-99 (Pa.Super. 2000) (quoting *Commonwealth v. Beasley*, 761 A.2d 621, 625-26 (Pa.Super. 2000), *appeal denied*, 565 Pa. 662, 775 A.2d 801 (2001)). "These circumstances are to be viewed through the eyes of a trained officer."

*Commonwealth v. Jackson*, 907 A.2d 540, 543 (Pa.Super. 2006).

> In making this determination, we must give due weight…to the specific reasonable inferences the police officer is entitled to draw from the facts in light of his experience. Also, the totality of the circumstances test does not limit our inquiry to an examination of only those facts that clearly indicate criminal conduct. Rather, even a combination of innocent facts, when taken together, may warrant further investigation by the police officer.

*Commonwealth v. Young*, 904 A.2d 947, 957 (Pa.Super. 2006), *appeal denied*, 591 Pa. 664, 916 A.2d 633 (2006) (internal citations and quotation marks omitted).

Further, we note that the duration of police inquiries during a traffic stop is determined by the seizure's "mission" to address the traffic violation that warranted the stop, and to attend to related safety concerns. **See Commonwealth v. Ross**, 297 A.3d 787, 792 (Pa.Super. 2023) (citing **Rodriguez v. United States**, 575 U.S. 348, 135 S.Ct. 1609, 191 L.Ed.2d 492 (2015)). When a stop "lasts longer than is necessary to complete its mission," it becomes unlawful. **Ross, supra** (internal citations omitted). The critical question is not whether the inquiry occurs before or after the issuance of a ticket, but whether it prolongs or adds time to the stop. **See id.** While, for their own safety, officers may order drivers to exit the vehicle or ask whether a detainee has a weapon, not all inquiries are "incident to the stop's mission." **Id.** at 793. Notably, concern for officer safety alone cannot justify a "full field-type search." **Id.** (citing **Knowles v. Iowa**, 525 U.S. 113, 119 S.Ct. 484, 142 L.Ed.2d 492 (1998)). "Finally, an arrest or custodial detention must be supported by probable cause to believe the person is engaged in criminal activity." **Commonwealth v. Livingstone**, 644 Pa. 27, 36 n.1, 174 A.3d 609, 614 n.1 (2017).

Instantly, the suppression court found that Officer Brodzinski had both reasonable suspicion and probable cause to initiate a traffic stop due to

Flamer's failure to stop at a stop sign, and the authority to instruct Flamer and Brinson to exit the vehicle and provide their names and dates of birth. Nevertheless, the court found

> the traffic stop should have concluded before Officer Brodzinski called for the K-9 unit. The initial purpose of the stop, which was to issue a ticket for failure to stop at a stop sign, reasonably should have been completed by the time Officer Brodzinski requested the K-9 unit which occurred 10-15 minutes later. Consequently, Officer Brodzinski was not justified in prolonging the stop beyond the necessary duration unless he had probable cause. There was neither probable cause nor reasonable suspicion[6] to extend the traffic stop for up to 30 minutes for a K-9 search. [Appellees'] nervous behavior alone did not provide sufficient basis to warrant the search by the K-9 unit. Moreover, Officer Brodzinski detected the scent of marijuana in the vehicle 15 to 20 minutes after initiating the stop, which was after the traffic stop should have been concluded. Furthermore, even if the officer detected the odor of marijuana within a reasonable time frame during the stop, it is insufficient, standing alone, to establish probable cause for the K-9 search of the vehicle.

(Suppression Court Opinion at 5-6).

The record supports the suppression court's conclusions. Officer Brodzinski initiated a traffic stop because Flamer failed to stop at a stop sign. (**See** N.T. Suppression Hearing at 29-30). Flamer seemed "excitedly nervous," but cooperative, and gave Officer Brodzinski his license and

_____

[6] We reject the Commonwealth's suggestion that the court failed to apply the reasonable suspicion standard. The court's analysis makes clear that it found the officer lacked both reasonable suspicion and probable cause to prolong the vehicle stop. **See also** (Findings of Fact and Conclusions of Law (Brinson's case), filed 3/3/23, at 6) (stating there was no probable cause or reasonable suspicion to extend traffic stop for up to 30 minutes for K-9 search).

- 11 -

registration. (*See id.* at 33-34). He did not have proof of insurance. (*Id.* at 33). Brinson kept his head down during the entire stop; Officer Brodzinski recognized him from an earlier encounter. (*Id.* at 38).

Officer Brodzinski requested that Flamer exit the car and come to the passenger side window of the police car, and he complied. (*Id.* at 34). Flamer paced back and forth and, when asked where he was going, stated "a barbecue in southwest Philadelphia." (*Id.*) Officer Brodzinski asked why Flamer was nervous, and Flamer responded, "I'm not nervous, bro. I have nothing illegal in my car. I have nothing to be nervous for." (*Id.* at 35.) Officer Brodzinski then "asked [Flamer] again"[7] for consent to search the vehicle and Flamer stated that there was no reason to search, because he did not have any marijuana in the car. (*Id.*)

Officer Brodzinski asked Brinson to step out of the car, and advised Flamer that he would request a K-9 unit. (*Id.* at 36-37). Brinson "became aggravated" and accused Officer Brodzinski of racial bias, and Flamer stated, "go ahead, you can get the dog." (*Id.* at 37, 45). At that point, Officer Brodzinski had not noticed any contraband in the car, but called for a K-9 unit. (*Id.* at 38, 45). In total, about 10 to 15 minutes passed between Officer Brodzinski's initiation of the stop and his call for the K-9 unit. (*Id.* at 41, 69-70). Officer Brodzinski testified that he called for the K-9 unit because "of the

_____

[7] At this time, Officer Brodzinski had not yet testified that he had asked for consent to search a first time. (*Id.*)

nervousness and the behavior of both occupants." (**Id.** at 38).

Significantly, Officer Brodzinski offered no explanation or justification as to why he needed to prolong the stop or request a K-9 unit beyond the fact that Flamer and Brinson were nervous. He did not point to any further articulatable facts that would justify the extension of the stop and call for a K-9 unit, nor did he articulate any fears for his own safety or point to any facts that would justify such a fear. **See Ross, supra**. Therefore, we agree with the suppression court that Officer Brodzinski lacked reasonable suspicion to extend the stop and request a K-9 unit solely because Brinson and Flamer seemed nervous.[8] **See id. See also Commonwealth v. Cartagena**, 63

---

[8] We reject the Commonwealth's argument that Flamer consented to the search simply based on his comments to the effect that police officers could get or call the dog. We observe that consent is an exception to the warrant requirement, but such consent must be specific and unequivocal. **Commonwealth v. Reid**, 571 Pa. 1, 25, 811 A.2d 530, 544 (2002), *cert. denied*, 540 U.S. 850, 124 S.Ct. 131, 157 L.Ed.2d 92 (2003) (citations and footnote omitted). Here, Flamer's remark was neither specific nor unequivocal consent for the officer to conduct a K-9 sniff and potential search, particularly where the officer did not testify to clarifying that Flamer was giving consent. **See, e.g., Commonwealth v. Powell**, 994 A.2d 1096, 1102-03 (Pa.Super. 2010), *appeal denied*, 608 Pa. 665, 13 A.3d 477 (2010) (explaining that defendant's response of "nah" when asked if he had a problem with police searching his car was not unequivocal, specific consent to search vehicle). **Compare Commonwealth v. Carr**, 646 MDA 2022 (Pa.Super. filed Nov. 15, 2022) (unpublished memorandum), *appeal denied*, ___ Pa. ___, 295 A.3d 1274 (2023) (holding that defendant's consent was voluntary where defendant said, "go ahead and search the vehicle," officer clarified that defendant did not have to provide consent and the officer was not forcing him to provide consent, and defendant again said that he understood and that officer could conduct search of vehicle). **See also** Pa.R.A.P. 126(b) (stating we may rely on unpublished decisions of this Court filed after May 1, 2019 for
*(Footnote Continued Next Page)*

A.3d 294, 305 (Pa.Super. 2013) (*en banc*), *appeal denied*, 620 Pa. 728, 70 A.3d 808 (2013) (recognizing that "[i]t is the rare person who is not agitated to some extent when stopped by police[,]" and that nervousness alone cannot give rise to reasonable suspicion). Therefore, the Commonwealth's first issue merits no relief.

In its second issue, the Commonwealth argues that discovery of the firearm and narcotics was inevitable. The Commonwealth asserts that even if the traffic stop had not developed into a prolonged detention, Flamer was driving a vehicle without insurance, which would have required police to tow the car[9] and conduct a non-investigatory inventory search. The Commonwealth submits that the contraband would have been easily discovered upon such an inventory search. The Commonwealth concludes that the court should not have suppressed the evidence on this ground, and this Court must grant relief. We disagree.

The inevitable discovery doctrine provides:

> [E]vidence which would have been discovered was sufficiently purged of the original illegality to allow admission of the evidence… [I]mplicit in this doctrine is the

_____

persuasive value). In fact, Officer Brodzinski admitted at the suppression hearing that Flamer "kind of gave a yes/no answer, yes, I could and then no and then yes and then no" when the officer asked for consent to search. (**See** N.T. Suppression Hearing at 42).

[9] Police may lawfully impound a vehicle that lacks insurance pursuant to their "traditional community care-taking function." **Commonwealth v. Henley**, 909 A.2d 352, 365 (Pa.Super. 2006) (*en banc*), *appeal denied*, 592 Pa. 786, 927 A.2d 623 (2007).

> fact that the evidence would have been discovered despite the initial illegality.
>
> If the prosecution can establish by a preponderance of the evidence that the illegally obtained evidence ultimately or inevitably would have been discovered by lawful means, the evidence is admissible. The purpose of the inevitable discovery rule is to block setting aside convictions that would have been obtained without police misconduct.

***Commonwealth v. King***, 259 A.3d 511, 522 (Pa.Super. 2021) (quoting ***Commonwealth v. Bailey***, 986 A.2d 860, 862 (Pa.Super. 2009), *appeal denied*, 606 Pa. 660, 995 A.2d 350 (2010)). Notably, "the inevitable discovery doctrine is not a substitute for the warrant requirement. Police must demonstrate that the evidence **would** have been discovered absent the police misconduct, not simply that they somehow **could** have lawfully discovered it." ***Commonwealth v. Perel***, 107 A.3d 185, 196 (Pa.Super. 2014), *appeal denied*, 633 Pa. 749, 124 A.3d 309 (2015) (emphasis in original).

Further, our Supreme Court has outlined the requirements of an inventory search as follows: "An inventory search of an automobile is permissible when (1) the police have lawfully impounded the vehicle; and (2) the police have acted in accordance with a reasonable, standard policy of routinely securing and inventorying the contents of the impounded vehicle." ***Commonwealth v. Lagenella***, 623 Pa. 434, 447, 83 A.3d 94, 102 (2013) (internal citation omitted). This search should be conducted not for the sole purpose of investigation. ***See id.***

It is the Commonwealth's burden to prove that the search was an

inventory search, *i.e.*, that it was conducted in accordance with a reasonable, standard policy. ***See Commonwealth v. Hennigan***, 753 A.2d 245, 255-56 (Pa.Super. 2000). ***See also Lagenella, supra***. The Commonwealth may meet this burden by presenting testimony or other evidence from officers regarding the relevant policies in place. ***See, e.g., Commonwealth v. Legette***, No. 2348 EDA 2023 (Pa.Super. filed July 17, 2024) (unpublished memorandum) (wherein officer testified that department policy provides for inventory search before tow company impounds vehicle; purpose of policy is to secure vehicle owner's property, to protect department from liability, and to ensure officer safety; and policy stated that inventory search must be conducted in good faith and not for purposes of gathering incriminating evidence or contraband). ***Compare Commonwealth v. West***, 937 A.2d 516, 529 (Pa.Super. 2007), *appeal denied*, 596 Pa. 754, 947 A.2d 737 (2008) (holding that inventory search was invalid where Commonwealth did not offer testimony explaining policy and full manner in which inventory search was conducted and failed to show department had in place and employed standard, reasonable policy when searching vehicle; "the suppression transcript simply does not contain testimony showing the department had in place and employed a standard, reasonable policy when searching the vehicle. The Commonwealth had the burden to demonstrate **the particulars of that policy and to show the search was done in accordance therewith**. Having not done so, the search cannot be upheld as a valid inventory search")

- 16 -

(emphasis added).

In *Commonwealth v. Brevard*, No. 947 WDA 2022 (Pa.Super. filed Dec. 5, 2023) (unpublished memorandum), this Court rejected the Commonwealth's argument that police had conducted a valid inventory search. Therein, the defendant was arrested after officers attempted to conduct a traffic stop and the defendant ultimately led them on a chase which resulted in a car crash. Police towed the inoperable vehicle from the scene and conducted an inventory search, recovering a semiautomatic handgun and marijuana. An officer prepared a departmental tow slip noting the items located during the inventory search.

The defendant sought to suppress the items recovered. At the suppression hearing, the arresting officer[10] testified that he had reviewed the department's policy regarding towing and inventory searches and that the policy is to write on a "tow slip" any items that are removed from a vehicle and "items of value that shouldn't be left in the car so there's no recourse down the road." *See id.* at 3. However, the officer was "not sure of all the verbiage" from the policy, did not testify what the policy provided about the procedure and scope of an inventory search, and the Commonwealth did not introduce a written policy into evidence. *Id.* The suppression court denied the motion, finding that the officers had acted reasonably.

_____

[10] The arresting officer was not the officer who had conducted the inventory search.

On appeal, this Court reversed. In so doing, we examined the requirement that police establish they conducted a reasonable inventory search:

> We conclude that the Commonwealth's evidence at the hearing was insufficient to demonstrate that the police conducted a reasonable inventory search pursuant to their standard policy. First, there was sparse evidence about what the Edgewood Police Department policy on inventory searches said about the scope and manner of inventorying an impounded vehicle. No written policy was introduced into evidence. Officer Susalla had reviewed the policy but did not remember its "exact verbiage." He did not say how an inventory should be conducted pursuant to the policy. The only details about the requirements of the policy were Officer Susalla's testimony about which items should be listed on a tow slip. This limited evidence effectively precludes any analysis of whether the departmental policy at issue was constitutionally reasonable.

**Brevard, supra** at 12 (citations omitted). As a result, this Court concluded that the Commonwealth had failed to meet its burden of proof that the search complied with a reasonable, standard policy, and was conducted in good faith without an investigatory motive. **Id.** at 14. Thus, this Court reversed the denial of the suppression motion.

In **Commonwealth v. Henderson**, No. 882 MDA 2023 (Pa.Super. filed Sept. 19, 2024) (unpublished memorandum), this Court recently considered the applicability of the inevitable discovery doctrine. In that case, police stopped the defendant at a traffic stop for a suspended vehicle registration and observed a digital scale with apparent marijuana shake on it in the car's center console. The defendant was removed from the car and patted down,

and police recovered marijuana from his pocket. A second trooper retrieved the scale from the console, and in the process, saw a handgun under the console.

The defendant sought to suppress the scale, marijuana, and handgun. The suppression court granted relief concerning the marijuana seized from the defendant's person and as to the handgun. Specifically, the court held that the pat-down search of the defendant's person was unlawful because the defendant was not under arrest and the troopers had no reason to believe there was a danger to their safety at the time of the pat-down. Additionally, the court found the handgun was not in plain view, the defendant did not consent to the search, and that the inevitable discovery doctrine did not apply.[11] The Commonwealth appealed. On appeal, this Court analyzed the court's application of the inevitable discovery doctrine as follows:[12]

> Here, as the trial court correctly observed, the Commonwealth did not show that Defendant's car was towed or impounded or that it would have been towed or impounded if the troopers had not found the handgun in the car. **Rather, the only evidence concerning towing or impounding that was presented at the suppression hearing was that the car could have been towed, not that it was towed or necessarily would have been towed**.

---

[11] The court denied the defendant's suppression motion concerning the digital scale, which the court said was in plain view at the time of the vehicle stop.

[12] This Court held that the Commonwealth waived its challenge concerning the court's suppression of the bag of marijuana recovered from the defendant's person for failure to raise that claim in its Rule 1925(b) statement. Moreover, this Court reasoned that such a challenge failed on the merits in any event.

> The trial court therefore correctly concluded that the inevitable discovery doctrine did not apply.

*Henderson, supra* at 14 (internal citations omitted) (emphasis added). Thus, this Court affirmed the suppression of evidence.

Instantly, Officer Brodzinski testified at the suppression hearing that he had the authority to tow the vehicle based upon Flamer's lack of insurance. (N.T. Suppression Hearing at 32). However, Officer Brodzinski later admitted that he does not always have a vehicle towed if an owner lacks insurance, and that towing is discretionary. (*See id.* at 58). Additionally, Officer Brodzinski stated that there was "no certain procedure" for towing a vehicle. (*Id.* at 52). Later on, Officer Brodzinski attempted to clarify that an inventory search is a "search for valuables, so when [the vehicle] goes to a tow yard,…the vehicle owner can't say that anything was stolen out of the vehicle." (*Id.* at 75-76). Officer Brodzinski conducts an inventory search on every vehicle that is **going to be** towed and that he looks in "everywhere … wherever they can put something valuable." (*See id.* at 76) (emphasis added). Officer Brodzinski stated that this is department policy, but he did not elaborate further on said policy. (*See id.*)

Further, Officer Brodzinski admitted that he did not begin to conduct an inventory search or pull the car over to a safer spot on the side of the street. (*Id.* at 59-60). Rather, Officer Brodzinski testified that he did not conduct an inventory search "because [he] knew [he] was applying for a search

- 20 -

warrant."[13] (*Id.* at 77). The Commonwealth did not present any additional evidence regarding Colwyn Borough's policies regarding when and how vehicles are able to be towed or regarding inventory searches.

Under these circumstances, application of the inevitable discovery doctrine is improper. While Officer Brodzinski had the authority to impound the vehicle under the community caretaking function (*see Henley, supra*), he presented no further evidence or testimony regarding Colwyn Borough's policies regarding tows and impounds for lack of insurance and, indeed, admitted that such seizures were discretionary and that there was "no particular policy" in place. (*See* Findings of Fact and Conclusions of Law at 3) (stating that officer testified that it was discretionary whether to tow vehicle for failure to have insurance; moreover, Colwyn Borough had no certain procedure of how vehicle gets towed). Thus, we cannot say that any policy or procedure in place would have necessarily led to an inventory search,[14] and, absent testimony about the particulars of the department policy, we

---

[13] The search warrant was based on the K-9 sniff; as previously discussed, however, the officer lacked reasonable suspicion to conduct the K-9 sniff.

[14] The facts of this case are distinguishable from scenarios where police lawfully arrest the driver of a vehicle and are required to tow the vehicle. *See, e.g., Commonwealth v. Curry*, 277 A.3d 1126 (Pa.Super. 2022) (unpublished memorandum) (reversing order suppressing evidence seized from defendant's vehicle; holding that inevitable discovery doctrine applied because, had officer refrained from conducting unlawful warrantless search of vehicle, police **would have** nonetheless impounded vehicle pursuant to defendant's lawful arrest and would have discovered contraband inside center console during routine inventory search).

cannot analyze whether such policy was constitutionally reasonable. *See Lagenella, supra*; *Hennigan, supra*; *West, supra*; *Legette, supra*; *Brevard, supra*.[15]

On this record, Officer Brodzinski presented evidence solely that the evidence **could** have been lawfully discovered, not that it **would** have been lawfully discovered pursuant to a constitutionally sound inventory search. *See Perel, supra*; *Henderson, supra*. Thus, the Commonwealth's second issue on appeal merits no relief. Accordingly, we affirm.

Orders affirmed.

President Judge Emeritus Panella joins this opinion.

President Judge Emeritus Stevens files a dissenting opinion.

---

[15] Although the dissent cites *Legette, supra* to opine that the department policy discussed in this case comports with the law and analogizes the facts of this case to those in *Legette*, *Legette* is distinguishable. In that case, the Commonwealth introduced testimony/evidence of a department policy that stated that inventory searches must be conducted in good faith and not for purposes of gathering incriminating evidence or contraband. *See Legette, supra*. Here, however, Officer Brodzinski did **not** testify that any department policy on inventory searches specified that such searches must be conducted in good faith and not for the purposes of gathering incriminating evidence or contraband. *Compare id.* We reiterate that the Commonwealth did not introduce any written department policy as evidence at the suppression hearing. Although there is no requirement for the written policy for inventory searches to be presented to the court, the Commonwealth must still present evidence that an inventory search was conducted pursuant to standard police procedure, and in good faith. *See Commonwealth v. Gatlos*, 76 A.3d 44, 59 (Pa.Super. 2013).

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


Date: <u>12/9/2024</u>